## 41673. BLANKS v. THE STATE.
(330 SE2d 575)

BELL, Justice.

This is a death penalty case. Appellant, Kenneth Blanks, was convicted in Glynn County of burglary, theft by taking, and two counts of malice murder. The case is here on direct appeal, for review under the Unified Appeal Procedure (252 Ga. A-13 et seq.), and for the sentence review required by OCGA § 17-10-35.[1]

### Facts

Blanks, an Atlanta resident, came to the Brunswick area seeking employment. There he met Theodore Woodard, who was employed by a landscaping firm whose customers included Sea Island residents Mr. and Mrs. William Roberts.

On Tuesday, July 26, 1983, Woodard did not report to work. According to a later statement by Blanks, he and Woodard obtained a sawed-off .410 shotgun and some electrical tape and forcefully entered the Roberts' home on the evening of July 26. The home was ransacked and its occupants tied up and killed.

Blanks and Woodard drove the victims' green BMW sedan to Atlanta and pawned a number of items taken in the burglary. Blanks was seen in Atlanta brandishing the .410 shotgun and also a .38 caliber pistol.

That Friday the two drove the Roberts' BMW back to Brunswick. There, Blanks was seen with a wad of money. He tried unsuccessfully to sell some furs which were in the trunk of the BMW. Later, he gave his girl friend a watch that had belonged to Mrs. Roberts.

The next day Blanks and Woodard robbed a taxi driver and shot him in the back with the .410 shotgun.

Not until that day were the Roberts discovered. After being contacted by a neighbor, police entered the Roberts' home and found chairs overturned, blood on the carpet, and papers and magazines spread about.

In one bathroom, Mr. Roberts' body was found sitting in a bath-

---

[1] The jury returned its sentencing verdict January 31, 1984. Blanks filed a motion for new trial on February 24, 1984. The motion was heard August 23rd and denied September 4, 1984. The case was docketed in this court October 30, 1984 and orally argued January 15, 1985.

tub, his hands and feet bound by electrical tape. More electrical tape encircled his body and looped over the shower rod. His arms and wrists were cut and bruised. A can of Mace lay nearby, as did two metal vacuum cleaner extension tubes, one of which was covered with blood. Blood spattered the walls of the bathroom.

In another bathroom, Mrs. Roberts' nude body was discovered, face down, in a tub full of water. Her hands were bound with electrical tape. An autopsy showed evidence of traumatic injury to the vaginal canal.

Both Mr. and Mrs. Roberts had their heads wrapped with multiple, alternating layers of fabric and electrical and packing tape which caused their deaths by suffocation.

On Saturday evening, Blanks and Woodard parted company. Early the next morning, Woodard was arrested. He told the officers that he had ingested paraquat, and he died two days later.

Tuesday evening, August 2, 1983, Blanks was arrested in an Atlanta bus station. In his possession was a gold watch that had belonged to Mr. Roberts' father.

The evidence was sufficient to support the convictions. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

### Enumerations of Error

1. Blanks first contends that the trial court erred by refusing to grant a change of venue. See OCGA § 17-7-150.

Ninety-five prospective jurors underwent voir dire, of whom 26 were excused for having an opinion about the case or for other bias or prejudice.[2] Thus, although the trial court was quite liberal in granting defense challenges for cause, only 27% of the venire was "excused for bias, prejudice, and prior opinion, and not all of these were tainted by pre-trial publicity." *Spivey v. State*, 253 Ga. 187, 198 (319 SE2d 420) (1984). We therefore conclude that the trial court did not err by finding that Blanks could receive a fair trial in Glynn County or by refusing to grant a change of venue. *Castell v. State*, 250 Ga. 776 (6b) (301 SE2d 234) (1983); *Waters v. State*, 248 Ga. 355 (1) (283 SE2d 238) (1981).

2. At the scene of his arrest, Blanks was advised of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). He was placed into a waiting police car, and there began to tell the officers about the murders. One of the officers interrupted him and again advised him of his *Miranda* rights. Then Blanks admitted to the officers that he had been at the Roberts' home with Woodard

---

[2] In addition, nine jurors were excused for opposition to the death penalty, two were excused for health reasons, and one was excused because she had a young child at home.

and had helped tape the victims to some chairs. He had observed Woodard undressing Mrs. Roberts and cutting the hands of Mr. Roberts. However, Blanks denied having himself killed either victim.

Blanks told the officers that he and Woodard had pawned in the Atlanta area a number of items taken from the Roberts' home. He proceeded to direct the officers to various locations in the city and was able to identify two of the pawn shops. (Some of the pawned items consequently were recovered.) Afterwards Blanks was given something to eat and taken to the Fulton County Jail, where, at his request, he was given a private cell. The record shows that for a significant period of time during this incarceration, Blanks had access to a telephone. There is no indication in the record that he took advantage of this opportunity, for example, to call a relative or an attorney.

The next day, Blanks was transported to GBI headquarters and interrogated by three GBI agents and two Glynn County policemen.

After again being advised of his *Miranda* rights, Blanks signed a written waiver of rights and gave an oral statement, and then a lengthy, tape-recorded statement, in which he again admitted his presence at the scene of the crime, but sought to attribute his participation (taping the victims, helping to carry them to the bathrooms, and holding them down while Woodard killed them) to fear of Woodard.

Recording the statement took both sides of two cassette tapes (about 2 hours). At some point after the insertion of the second tape, the interrogating officers received a note that an attorney was outside and wanted to talk to Blanks. Since Blanks had not requested an attorney and was talking freely, they continued the interview, without showing the note to Blanks.

At the close of the interview, Blanks was told that the officers had no further questions. Blanks at that point stated that he wanted to see a lawyer.[3] The interview was terminated.

Blanks was brought to the headquarters lobby and the attorney, who had been retained by the defendant's father, spoke with Blanks for several minutes. Afterwards, Blanks was transported to Glynn County.

(a) In his second enumeration of error Blanks contends the court erred by allowing the taped statement to be introduced in evidence, or at least so much of the statement as was taped after the arrival of

---

[3] Blanks may not have meant that he wished to see an attorney at that moment. In fact, when approached by the attorney hired by his father, Blanks asked if it could not wait until he got back to Brunswick. Nonetheless, he might have meant that he wished not to be further questioned until he had an opportunity to talk to an attorney, whenever that happened.

Therefore, for purposes of this appeal we will assume, without deciding, that he meant the latter.

the attorney at GBI headquarters.

In essence, Blanks is asking us to adopt a variant of the "New York rule," which provides that: "Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel." *People v. Arthur*, 239 NE2d 537, 539 (N.Y. 1968).

The New York rule may be invoked on behalf of any suspect by any attorney; it is not necessary that there be any attorney-client relationship between the two. Id. at 538. Nor must the attorney be physically present at the place where the suspect is in custody. *People v. Gunner*, 205 NE2d 852, 855 (N.Y. 1965). Other states have adopted variants of the rule which, in contrast to the New York rule in its purest form, typically require an attorney-client relationship (which may be created on behalf of the suspect by third parties) and actual physical presence of the attorney at the interrogation site. See, e.g., *Weber v. State*, 457 A2d 674 (Del. 1983); *State v. Matthews*, 408 S2d 1274 (La. 1982).

The same criticism is applicable to the New York rule and to its variants: "Whatever its symbolic value, a rule that turns on how soon a defense lawyer appears at the police station or how quickly he 'spring(s) to the telephone' hardly seems a rational way of reconciling the interests of the accused with those of society." Kamisar, *Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When Does it Matter?* 67 Geo. L.J. 1, 95 (1978). The desirability of legal assistance during interrogation does not turn upon the rapidity with which third parties have acted to retain an attorney to enter the proceedings. If *Miranda* warnings are insufficient to protect Fifth Amendment rights, this insufficiency can be better addressed than by a rule which would protect only those with the money and connections "to bring a lawyer swiftly into the fray" and which "would seem to favor the 'professional criminal' most of all." Id. at 95-96.

"[W]e are of the opinion that the principles of *Miranda* place the assertion of the right to remain silent and the right to counsel upon the accused, and not upon benign third parties, whether or not they happen to be attorneys." *State v. Burbine*, 451 A2d 22, 28 (Rhode Island 1982). See *Stevens v. State*, 247 Ga. 698 (7) (278 SE2d 398) (1981).

In this case, Blanks was advised of his right to legal assistance on numerous occasions. The record shows overwhelmingly that he knowingly, intelligently, and voluntarily waived this right and spoke willingly to law enforcement officers. We find no Fifth Amendment error here.

(b) Additionally, Blanks contends that any statements and other evidence obtained as a result of interrogation during his return to

Brunswick are inadmissible inasmuch as by this time he had requested an attorney. Compare *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981). Even assuming this contention to be correct,[4] we find no error, since no statements of any kind made by Blanks on this return trip were admitted in evidence and since Blanks has not shown that any other evidence was obtained as a result of any return-trip interrogation.

3. In his third enumeration Blanks complains of the court's denial of the discovery of statements made by co-defendant Woodard after his arrest. Blanks argues that although these statements would not have been admissible in the guilt-innocence phase of the trial, they might have been admissible in mitigation during the sentencing phase. See *Green v. Georgia*, 442 U. S. 95 (99 SC 2150, 60 LE2d 738) (1979).

Regardless of whether or not Woodard's statements could have been offered by the defense at the sentencing phase of the trial (and pretermitting any question of the wisdom of the state's refusal to disclose these statements), we find no error here.

Woodard's statements are in the state's file, a copy of which was sealed and made part of the record on appellate review. Essentially, Woodard painted Blanks as the real culprit who committed all the egregious acts relating to the crimes. The state would doubtless have been delighted to offer these statements in aggravation if allowed to do so. Blanks was not denied mitigating evidence, and this enumeration is meritless.

4. In his fourth enumeration Blanks complains of the state's proof that he participated in the murder of a taxi driver four days after the Roberts were murdered.

We find no error. Blanks' contention at trial was that he was an unwilling participant in the Roberts' murders. This contention is refuted by proof that four days later he participated in the commission of another murder for the same motive (money) and with the same co-defendant (Woodard). This "other crime" evidence was therefore admissible. *Putman v. State*, 251 Ga. 605 (2) (308 SE2d 145) (1983).

5. In his fifth enumeration Blanks contends the state went outside the evidence during its guilt-innocence phase argument. In the instance complained of, the state referred to a statement made by Blanks during custodial interrogation. The state's argument was based on evidence admitted at trial, and Blanks' contention to the contrary is incorrect.

6. In his sixth enumeration Blanks contends the trial court erroneously failed to instruct the jury that the defendant could be found

---

[4] See fn. 3. Compare *Ross v. State*, 254 Ga. 22 (3a) (326 SE2d 194) (1985).

not guilty of murder. A review of the transcript, as corrected, shows that the trial court did not err.[5]

7. Finally, Blanks complains in enumeration seven that the trial court erred by failing to charge on felony murder.

Blanks was originally indicted for malice murder *and* felony murder, in separate counts. Prior to trial, he filed a motion seeking to require the state to elect between the two theories and proceed only on one. The trial court reserved a ruling on this motion until the close of the evidence, at which time the court asked the attorneys to state their position on the motion. Blanks' attorneys announced: "Your honor, we would stand on the motion as submitted to the Court." The state thereafter withdrew the two felony murder counts. At this point, the defense objected and asked the court to charge on felony murder. The court refused. Now Blanks argues that his death sentence must be reversed, based on the holding of *Beck v. Alabama*, 447 U. S. 625 (100 SC 2382, 65 LE2d 392) (1980).

We find, however, that we need not address this contention. Blanks' belated request to charge felony murder came only after he had throughout the trial of the case sought to require the state to make an election between proceeding on a felony-murder theory and proceeding on a malice-murder theory. The state made that election, and Blanks will not now be heard to complain that it did.

*Review Under the Unified Appeal Procedure*

8. Under Rule IV (B) (2) of the Unified Appeal Procedure, this court reviews the entire record of the case "to review each assertion of error timely raised by the defendant during the proceedings in the trial court" whether or not presented to the trial court by way of motion for new trial or enumerated as error on appeal. 252 Ga. at A-28. With this requirement in mind, we address a matter not raised on

---

[5] What should have been transcribed as a complete sentence and placed at the end of the court's murder charge was instead transcribed originally as a sentence fragment and placed at the beginning of the court's charge on burglary. The charge, as originally transcribed, thus read as follows: "I charge you that if you find and believe that . . . the defendant did in the county of Glynn and in the state of Georgia with malice aforethought kill and murder William Britt Roberts and/or Merle Montgomery Roberts in the way and manner set forth in the indictment, then you would be authorized to find the defendant guilty.

"*If, however, you find the state has failed to prove his guilt beyond a reasonable doubt, or you have a reasonable doubt as to his guilt, then you should acquit* Count 5 of the indictment which charges the defendant with burglary." (Emphasis supplied.)

The error in transcription is obvious from any fair reading of the charge.

Moreover, even if the sentence had been entirely omitted, this enumeration would be meritless, since later in the charge the court specifically told the jury: "[I]f, however, on either Count 1 or 3 you find the defendant not guilty, the State has failed to prove his guilt beyond a reasonable doubt or you entertain a reasonable doubt as to his guilt, you will write in the word[s] 'not guilty' [on the verdict form]."

appeal.

Blanks did not testify during the guilt-innocence phase of the trial. He did testify at the sentencing phase, as the first defense witness. After telling the jury about his background, he was asked if there was anything he wanted to tell the jury. He answered yes. Then the following transpired:

"Q [By Mr. Lawson, for the defendant]: What is it you want to tell them?

"A: That I was there, but —

"Mr. Thomas [for the state]: Objection, now, Your Honor, we're not going to go into anything that occurred in the house, for that matter, it's already been settled by the verdict of this jury, sir.

"The Court: Response.

"Mr. Lawson: I simply gave the defendant, Your Honor, an opportunity to make a statement to the jury if he so desired. I'll stand on the ruling of the Court.

"The Court: All right. The objection is sustained.

"Mr. Lawson: I have no other questions, Your Honor."

In *Eberheart v. State*, 232 Ga. 247, 253 (206 SE2d 12) (1974) it was held: "The bifurcated trial was created to withhold matters inadmissible on the issue of guilt or innocence from the jury until that issue had been determined. The statute is clear that the pre-sentence hearing is for additional evidence and in no way excludes from consideration on sentence the matters heard on the issue of guilt or innocence."

In *Brown v. State*, 235 Ga. 644, 648 (220 SE2d 922) (1975), we stated: "In the present case the defendant did not testify on the guilt or innocence phase of his trial. He did testify on the presentence hearing and thus the question is clearly presented as to whether a defendant who remains silent on the guilt or innocence phase is precluded from testifying to the circumstances surrounding the crime prior to being sentenced." We answered the question in the negative, and held that a defendant was not precluded from so testifying.

In *Blankenship v. State*, 251 Ga. 621, 624 (308 SE2d 369) (1983), we held that "the parties are entitled to offer evidence relating to circumstances of the crime" at the sentencing phase of a death penalty case. Even though such evidence cannot affect the conviction, it is nonetheless relevant to sentence.

The court therefore erred in this case by sustaining the state's objection.

However, we find no reversible error here. Blanks made no offer of proof as to what he would have said if he had been allowed to answer the question, and it is not a foregone conclusion that he was going to testify to the circumstances of the offense (or as the state put it, to "anything that occurred in the house"). More importantly, just

before the defense rested, the trial court stated: "Before you rest this portion of the case, Mr. Lawson, under the authority of *Blankenship v. State*, [supra, which had been decided just a couple of months earlier], I will give you the opportunity to introduce into evidence in this phase of the trial any evidence from the guilt or innocence portion of the trial, or question any witness about testimony given in that portion of the trial irrespective of any rulings I've previously made in the case. In other words, any evidence for consideration as a mitigating factor, any aspect of the defendant's character or record in [sic (and?)] any of the circumstances of the offense that the defendant wants to proffer as a basis for a sentence less than capital punishment. I give you that opportunity."

That opportunity was declined.

In these circumstances, the court's erroneous initial ruling was harmless beyond a reasonable doubt.

### Sentence Review

9. Blanks was sentenced to death on Counts 1 and 3 (the malice murder counts). As to each count, the jury found: (1) that the murder was "outrageously vile, horrible, or inhuman in that it involved torture, depravity of mind or an aggravated battery"; and (2) that the murder was committed during the commission of armed robbery, burglary, and murder. See OCGA § 17-10-30 (b) (2) and (b) (7).

The evidence shows that Blanks and Woodard, armed with deadly weapons, forced their way into the Roberts' home; taped the victims to chairs; tortured Mr. Roberts by cutting his hands with a knife, beating him on the head with a metal vacuum cleaner tube and spraying him with Mace; tortured Mrs. Roberts by sexually abusing her; further tortured both victims by wrapping layers of towelling around their heads, thus causing their deaths by suffocation; and stole numerous items from the victims, including furs, jewelry, and an expensive automobile.

The jury's findings of statutory aggravating circumstances are supported by the evidence beyond a reasonable doubt. OCGA § 17-10-35 (c) (2).

We note that although the doctrine of "mutually supporting aggravating circumstances" precludes imposition of two death sentences where the sole statutory aggravating circumstance is that a double murder has been committed, in view of the additional aggravating circumstances found here, the fact that each murder is a statutory circumstance supporting the death penalty for the other does not require the reversal of either sentence. *Putman v. State*, 251 Ga. 605 (12), supra.

10. Even accepting at face value Blanks' self-serving attempt to

portray Woodard (whom Blanks outweighed by some 50 pounds) as the more culpable actor in this crime, Blanks clearly was an active participant in the burglary of the Roberts' home and in the armed robbery and torture-murder of the couple. The death penalty is neither excessive nor disproportionate in this case. OCGA § 17-10-35 (c) (3).

11. We find that the sentences of death were not imposed in this case under the influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1).

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Ingram v. State,* 253 Ga. 622 (323 SE2d 801) (1984); *Finney v. State,* 253 Ga. 346 (320 SE2d 147) (1984); *Spivey v. State,* 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State,* 252 Ga. 227 (314 SE2d 83) (1984); *Putman v. State,* 251 Ga. 605 (308 SE2d 145) (1983) *Wilson v. State,* 250 Ga. 630 (300 SE2d 640) (1983); *Williams v. State,* 250 Ga. 553 (300 SE2d 301) (1983); *Rivers v. State,* 250 Ga. 288 (298 SE2d 10) (1982); *Jones v. State,* 249 Ga. 605 (293 SE2d 708) (1982); *Mathis v. State,* 249 Ga. 454 (291 SE2d 489) (1982); *Berryhill v. State,* 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State,* 247 Ga. 27 (277 SE2d 1) (1981); *Stevens v. State,* 245 Ga. 583 (266 SE2d 194) (1980); *Burger v. State,* 245 Ga. 458 (265 SE2d 796) (1980); *Amadeo v. State,* 243 Ga. 627 (255 SE2d 718) (1979); *Westbrook v. State,* 242 Ga. 151 (249 SE2d 524) (1978); *Morgan v. State,* 241 Ga. 485 (246 SE2d 198) (1978); *Stanley v. State,* 240 Ga. 341 (241 SE2d 173) (1977); *Thomas v. State,* 240 Ga. 393 (242 SE2d 1) (1977); *Corn v. State,* 240 Ga. 130 (240 SE2d 694) (1977); *Young v. State,* 239 Ga. 53 (236 SE2d 1) (1977); *Dix v. State,* 238 Ga. 209 (232 SE2d 47) (1977); *Street v. State,* 237 Ga. 307 (227 SE2d 750) (1976); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1974); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *McCorquodale v. State,* 233 Ga. 369 (211 SE2d 577) (1974); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974).

DECIDED JUNE 10, 1985.

*Donald E. Manning,* for appellant.
*Glenn Thomas, Jr.,* District Attorney, *Michael J. Bowers,* Attor-

ney *General, Eddie Snelling, Jr., Senior Attorney,* for appellee.