S93A1044. ALEXANDER v. THE STATE.
(435 SE2d 187)

SEARS-COLLINS, Justice.

Reginald Alexander appeals his convictions of involuntary manslaughter, felony murder, arson in the first degree, and trafficking in cocaine.[1] The trial court merged the involuntary manslaughter conviction and the arson conviction into the felony murder conviction, and sentenced Alexander to life imprisonment for felony murder. The court sentenced Alexander to a term of years for trafficking in cocaine, to run consecutively with the life sentence.

---

[1] The crimes were committed on March 1, 1991. Alexander was indicted on March 8, 1991, tried January 6-14, 1992, and sentenced on January 17, 1992. Alexander's motion for new trial was filed on January 29, 1992, and was denied on February 8, 1993. Alexander filed his notice of appeal March 3, 1993. The court reporter certified the transcript on March 31, 1993. The appeal was docketed in this Court on April 9, 1993, and oral arguments were heard on June 22, 1993.

1. Alexander and the victim, Carla Breach, had a turbulent romantic relationship for a period of months before March 1, 1991. On that day, Breach's apartment exploded in flames and Breach received second and third degree burns over 95 percent of her body. She died from those burns the next day. When considered in the light most favorable to the verdict, the evidence presented at trial was sufficient for the jury to find beyond a reasonable doubt that Alexander intentionally poured gasoline on Breach, struck a match, and tossed the lighted match in the puddle of gasoline at Breach's feet.[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). After being served with an arrest warrant, Alexander gave a written statement to police, in which he claims that the death was accidental.

2. In his first four enumerations of error, Alexander alleges that the prosecutor committed misconduct which warranted a mistrial under case law, OCGA § 17-8-75,[3] or both:

(a) Alexander first contends that the prosecutor wrongly implied during closing argument that the fact that the defendant hired an attorney who began preparing his defense the day after giving his statement to police reflected on the appellant's guilt or innocence, and wrongly implied that defense counsel "planned" a portion of the defense by "strategically placing" exculpatory items in Alexander's car and having them photographed by a defense expert.[4] We find no error.

While counsel may not state "prejudicial facts which are not in evidence . . ., it is permissible for counsel to draw deductions from the evidence regardless of how illogical and unreasonable . . . ." (Citation omitted.) *Adams v. State*, 260 Ga. 298, 299 (392 SE2d 866) (1990). Each of the statements made by the prosecutor with respect to the photographs and the retention of counsel was drawn directly and solely from the photographs themselves or from testimony. Therefore, this was a " 'matter for reply by adverse counsel, not for rebuke by the court[,]' [cit.]," id., and a mistrial was not required.

(b) During closing argument, the prosecutor referred to testimony by Antonio Breach, the victim's brother, that Alexander and five as-

---

[2] The evidence presented at trial is detailed in the Appendix which follows this opinion.

[3] Defense counsel made timely objections to each of the statements made by the prosecutor during closing argument which are complained of on appeal. The trial court instructed defense counsel to reserve his objections until the end of closing argument and did not rebuke the prosecutor or give curative instructions to the jury. See OCGA § 17-8-75.

[4] The items in the photographs, which were introduced into evidence by the defense, included: boxing gloves in the trunk used to support Alexander's claim that he received the well-known nickname "Carver Homes Cash" because of his childhood love for boxing and for Cassius Clay; a plastic antifreeze container on the back floorboard used to support Alexander's claim that the gasoline which accelerated the fire was carried in that type of can; and a newspaper with the date of the fire plainly visible and partially covering a colorful thank-you note from Carla Breach to "Cash."

sociates, including a man named "Big Mike," had prepared cocaine for sale in the victim's apartment. The prosecutor said "Big Mike and the gang, and you've seen the gang here." The appellant argues that the prosecutor's use of the word "gang" in reference to the appellant's acquaintances and family present in the courtroom during the trial was cause for mistrial because of the negative connotations of the word "gang."

We find that the prosecutor's use of the word "gang" was not improper. In addition to Antonio Breach's testimony about Alexander's five "associates," the salesman who sold Alexander the car which he had been driving on the day of the fire testified that when Alexander bought the car at the dealership, he was accompanied by about eight men. Alexander himself testified regarding at least two occasions when he was out at a night club with a group of male friends. In light of this testimony, we find that the prosecutor's use of the word "gang," as in "Big Mike and the gang," was a reasonable reference to people who the evidence showed spent time with the appellant.

We do find troublesome the prosecutor's statement that "you've seen the gang here," apparently referring to persons who had been present in the courtroom during the trial. As the rule of sequestration was invoked and there were no witnesses in the courtroom, this gesture by the prosecutor related to matters not in evidence and cannot be lightly overlooked. However, an error is harmless if it is "highly probable that the error did not contribute to the jury's verdict." *Johnson v. State*, 238 Ga. 59, 61-62 (230 SE2d 869) (1976). We have carefully reviewed the entire record, and faced with the compelling evidence against Alexander (see Appendix), we conclude that the harmless error standard adopted in *Johnson* has been met.

(c) In his written statement to the police, Alexander said "Anyone who knows me would tell you I would never do that." The statement was read and introduced into evidence at trial. In her closing argument, the prosecutor referred to Alexander's written statement and asked the jury "Where is Big Mike? . . . Where are all those people" who would testify that Alexander was not the type of person who would commit the crimes with which he was charged? Alexander now contends that the prosecutor's comment was an improper attack on his character. See generally *Jones v. State*, 257 Ga. 753 (363 SE2d 529) (1988).

First of all, we note that it takes an inferential leap to construe the prosecutor's words as a comment on Alexander's character.[5] Fur-

---

[5] A prosecutor "may properly draw inferences in his argument from the nonproduction of witnesses," (citations omitted) *McGee v. State*, 260 Ga. 178, 179 (4) (391 SE2d 400) (1990) (but cf. *Blige v. State*, 263 Ga. 244 (430 SE2d 761) (1993) (prosecutor may comment on failure of defense to call expert witness only if existence of expert witness in evidence)), and

thermore, while counsel may not introduce facts which are not in evidence during closing argument, OCGA § 17-8-75, counsel has wide latitude during closing argument to remark upon the evidence and facts which are before the jury. See *Robinson v. State*, 257 Ga. 194, 196 (4) (357 SE2d 74) (1987). There is no question that Alexander's statement was part of the evidence before the jury, as it had been read in full from the witness stand.[6] The prosecutor's closing query to the jury about those people to whom Alexander refers in his written statement introduced nothing extrinsic to the evidence, as the comment was confined to the written statement, and the jury had observed the full complement of witnesses presented by the defense. Therefore, we hold that the closing argument was within the range allowed counsel when commenting on evidence properly admitted at trial.[7] See *Robinson*, supra, 257 Ga. at 196; see also *Blanks v. State*, 254 Ga. 420, 424 (5) (330 SE2d 575) (1985) (closing argument reference to statement made by defendant during custodial interrogation was not outside the evidence), cert. denied 475 U. S. 1090 (106 SC 1479, 89 LE2d 733).

(d) Next, Alexander contends that mistrial was required because the prosecutor gave her personal opinion as to the credibility of witnesses during closing argument.[8]

> [I]t is improper for counsel to state to the jury his personal belief as to the veracity of a witness. [Cits.] However, it is not improper for counsel to urge the jury to deduce such a conclusion from proven facts.

*Shirley v. State*, 245 Ga. 616, 618 (266 SE2d 218) (1980). The credi-

---

[6] may call a jury's attention to the failure of the defense to rebut the state's evidence, see generally *Shirley v. State*, 245 Ga. 616, 618 (266 SE2d 218) (1980); *Griffin v. State*, 191 Ga. App. 302, 304 (381 SE2d 562) (1989).

[6] Before the trial began, Alexander objected to the admission of his statement on the ground that it was not voluntarily given. However, at no time before or during the trial did Alexander object to the statement's admissibility on the basis of character and, hence, failed to preserve his right to object to the evidence on that basis on appeal, see *Reeves v. State*, 241 Ga. 44 (243 SE2d 24) (1978). Contrary to the dissent's contention, this waiver, while relevant, is not essential to the majority holding because Alexander is not objecting on appeal to the admission of the statement in evidence, but to the prosecutor's closing argument.

[7] Under a contrary decision, any portion of a defendant's statement reflecting positively on the defendant's character would not be subject to challenge or rebuttal by the state in any fashion.

Furthermore, as the issue is not before us, this decision does not address whether the prosecution's introduction of a defendant's statement which reflects on his character may open the door to the introduction of character testimony by the prosecution during the evidentiary phase of the trial.

[8] Referring to one witness, the prosecutor stated: "I thought he was extremely credible, and I thought you did, too"; to another: "I'll tell you it's true. I loved finding him"; and to a third: "Antonio told you the truth . . . . He was completely worthy of belief . . . ."

bility of each of the witnesses referred to by the prosecutor was attacked by the defense both in cross-examination and in closing argument. Upon review of the state's entire argument, it is clear that the tenor of the prosecutor's statements was to counteract the attacks by the defense and to urge the jury to believe the testimony of the witnesses based on the evidence, see *Shy v. State*, 234 Ga. 816, 824 (218 SE2d 599) (1975). Even so, the isolated remarks appear to express the prosecutor's personal beliefs, and were not proper. However, considering the entire closing argument, as well as the abundance of evidence against Alexander (see Appendix), we are convinced that it is "highly probable" that the jury would have reached the same verdict had these statements not been made. See *Johnson v. State*, 238 Ga. at 61-62.

(e) Finally, Alexander argues that the prosecutor's failure to provide the appellant with the correct address of a key state witness before trial demanded a mistrial. We find no error. The record reveals that the defense received the witness's street address, though not the building number, and that the defense was actually able to see the witness before trial, and the witness declined to discuss the case with the defense. See *Rhodes v. State*, 193 Ga. App. 28, 30 (386 SE2d 857) (1989).

3. The appellant argues that the trial judge erred in denying his motion for directed verdict on the arson charge, since the state did not offer any evidence of the appellant's intent to burn the victim's apartment. "Arson has three basic elements: (1) damage by fire or explosion; (2) the intentional act or direction of the defendant knowing that it will damage a protected structure; and (3) lack of the owner's consent." Kurtz, Criminal Offenses and Defenses in Georgia 7 (R. Cleary 3d ed. 1991). There is no dispute that the victim's apartment was damaged by fire without her consent, and that it is a protected structure under OCGA §§ 16-7-60 and 16-7-61. Furthermore, Alexander does not dispute that it was he who struck the match that started the fire, but he claims that it was an accident.

The state presented evidence that Alexander had threatened the victim's life more than once before the fire and had physically abused the victim. The state's arson expert testified that the fire began in a puddle of gasoline on the floor which was ignited close to the floor, and that the extent of Alexander's injuries and the fact that Alexander's clothes were not burned made the version of the fire set forth in Alexander's written statement impossible. We find that this evidence presented by the state supports a finding that the appellant's striking of the match was not accidental. Therefore, because "a motion for directed verdict in a criminal trial should only be granted where there is no conflict in the evidence and the evidence demands a verdict of acquittal as a matter of law," *Taylor v. State*, 252 Ga. 125, 127 (312

SE2d 311) (1984), we hold that the trial judge did not err in denying the appellant's motion for a directed verdict.

4. The appellant argues that the verdict of guilty of both felony murder and misdemeanor involuntary manslaughter is inconsistent and illogical, because to find the appellant guilty of involuntary manslaughter under OCGA § 16-5-3 (b) the jury had to have found that Alexander's act of striking the match was lawful. Therefore, the appellant argues, there was no unlawful act to constitute an aggravated assault to support the felony murder conviction, and that conviction should be vacated.

It has long been the rule in Georgia that "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." *Dunn v. United States*, 284 U. S. 390, 393 (52 SC 189, 76 LE 356) (1932). Accord *Milam v. State*, 255 Ga. 560, 562 (341 SE2d 216) (1986); *Smashum v. State*, 261 Ga. 248, 249 (403 SE2d 797) (1991). Furthermore, even assuming that an aggravated assault conviction was precluded in this case, the jury found the appellant guilty of arson, which was also named in the indictment as an underlying felony to the felony murder charge, and was merged into the felony murder conviction by the trial court. To convict a defendant for felony murder, it is not necessary that the jury find the defendant guilty of each and every underlying offense named in the indictment. See generally *State v. McBride*, 261 Ga. 60, 64 (3) (401 SE2d 484) (1991).

5. The appellant also argues that the doctrine espoused by this Court in *Edge v. State*, 261 Ga. 865, 867 (414 SE2d 463) (1992), should be extended to preclude the appellant's conviction for felony murder when the appellant was also convicted of involuntary manslaughter, and the felony murder conviction should therefore be merged into the involuntary manslaughter conviction, not vice versa.

In *Edge*, this Court adopted a modified version of the merger doctrine, holding that where there is only one assault which could form the basis of either felony murder or voluntary manslaughter, and a jury finds the assault was mitigated by provocation and passion, as evidenced by a conviction for voluntary manslaughter, then a concurrent conviction for felony murder must be vacated. Id. at 866. In this case, however, there is no issue involving provocation or passion, and no finding of provocation or passion by the jury. Therefore, *Edge* does not apply to this case, and we decline to expand the rule adopted in *Edge*.

*Judgment affirmed. All the Justices concur, except Fletcher, J., who concurs in the judgment only, and Benham, J., who dissents.*

APPENDIX.

A narcotics officer from the East Point Police Department, Ronald Walker, testified that he was called to the scene of the fire where he found a refrigerator in front of the apartment's rear door, which led into the kitchen. Walker also discovered in the kitchen approximately 1,000 small, empty, zip-lock plastic bags, several single-edged razor blades, several glass vials of the type commonly used to bake crack cocaine, and a large plastic bag containing more than 600 grams of cocaine powder hidden between the kitchen cabinets and the ceiling. Another witness testified that he had been to the victim's apartment earlier that month with a friend who bought crack cocaine from Alexander there. The witness stated that they bought the crack cocaine for resale.

Several witnesses testified with respect to the relationship between Alexander and the victim, Carla Breach. There was testimony that Alexander spit in the victim's face one night when the two saw each other in a nightclub, that the victim was seen with bruises on her face the day after she had gone home with Alexander from a nightclub, and that the same night the victim was heard to ask Alexander if he was going to beat her again, whereupon he replied that she had brought that upon herself. The victim's mother testified that the day before the fire she heard Alexander say to the victim that if she went out that night he would "pop a cap" in her head. The victim's brother, Antonio Breach, testified that during the month before the fire he heard his sister tell Alexander that she would no longer see him because he was married, and that Alexander told the victim that if he could not have her no one would. To the contrary, Alexander testified that it was he who sought to break off the relationship because of his marriage, and that Carla Breach begged him not to leave her. Antonio Breach also testified that one night while he was still living with his sister they left the apartment in fear and went to spend the night at their mother's house after Alexander threatened over the telephone to have someone come and "shoot up" the apartment.

Alexander testified that on the day of the fire his car ran out of gas as he was on his way to visit Breach, and that he took a can of gas with him to her apartment when she came to pick him up. Alexander claims that after he repeated to Breach that he would not be able to see her anymore because he was married, they argued and struggled over the gas can, spilling gas on themselves. Alexander testified that Breach then used a match to scare him, after which he took the match and "accidentally" lit it, starting the fire.

When the first emergency medical personnel arrived at the scene of the fire, the victim was on the lawn of the apartment complex, hav-

ing been helped out of the building by a passing motorist who saw the fire. They testified that the victim smelled of gasoline, and that all of the victim's clothes had been burned off, except for small bits which clung to her charred body. She was alert but sobbing with concern for her child, who had also been in the apartment. She was approached by Alexander, whose face and hands were burned but whose clothes and shoes were not burned and were completely intact, who said to the victim "I'm sorry, I'm sorry, I didn't mean to do it," to which the victim responded "Why did you do it?" Contrary to his testimony at trial about having lit the match because the victim had threatened to do the same to him after they fought, Alexander told a neighbor and a fireman at the scene that he had knocked the gas can over and the fire started when he began to light a cigarette.

The state's arson expert testified that the fire began in a puddle of gasoline on the floor which was ignited close to the floor, not at hand level. The expert also testified that if Alexander's clothing had had gasoline on it, as Alexander claims in his written statement, it would have burned when the room caught on fire, and Alexander would have sustained more injuries than the flash burns to his face and hands. Therefore, according to the expert, the version of the facts which Alexander sets forth in his written statement is impossible.

Both the physician and the anesthesiologist who treated the victim in the emergency room right after the fire testified that the victim was alert when she was brought in, that she was informed that her condition was not good and that she would need a tube in her throat, after which time she would be unable to speak. When asked how her injuries occurred, the victim stated that her boyfriend poured gasoline on her and lit her on fire. The same anesthesiologist also placed a tube in Alexander's throat as a precautionary procedure, and testified that before being intubated Alexander asked if the anesthesiologist was angry with him and was going to hurt him because of what he did to the victim.

Carla Breach died of her injuries the morning after the fire. Three days later, East Point police detective William Gorman went to the hospital to serve an arrest warrant on Alexander for the victim's murder. The physician attending Alexander testified that at the time of Detective Gorman's visit, Alexander was "alert, oriented, and responsive." After being advised of his *Miranda* rights, Alexander gave his written statement to Detective Gorman, which was read to the jury at trial.

The medical examiner who performed an autopsy on the victim's body testified that the victim was not pregnant at the time of her death. Another of the state's witnesses, Van Smith, testified that twice, after the fire but before the trial, he heard Alexander say "that he was glad that he burned the bitch up because she fucked up his

stuff," meaning his drugs.

BENHAM, Justice, dissenting.

In Div. 2 (c), the majority asserts that the prosecutor's query in closing argument ("Where are all those people [appellant] said, I'm not the kind of man who would do all these things? Where are they? Where are all these people [who are] going to get up here and say that he is not the kind of man to do all these things?") was a comment on facts in evidence since the statement had been read to the jury.[9] The majority then holds that appellant's failure to object to the admission of the statement on character grounds constituted a waiver of his right to assert on appeal that the prosecutor's argument impermissibly introduced character evidence. The majority then concludes that the prosecutor's statement was a proper comment on the evidence before the jury. I disagree with the majority's decision that there has been a waiver.

Evidence of a defendant's bad character is statutorily rendered inadmissible "unless and until the defendant shall have first put his character in issue." OCGA § 24-9-20 (b). Only where a defendant *elects* to put his good character in issue may the State present evidence of bad character. *Jones v. State*, 257 Ga. 753, 758 (363 SE2d 529) (1988). In the case at bar, appellant never introduced evidence of his good character. It was *the State* that introduced into evidence a pre-trial statement made by appellant. The majority opinion is implicitly holding that a defendant puts his character in issue when he makes a statement to police. The majority then goes on to require *the defendant* to seek redaction of anything positive he might have said about himself prior to the *State's* introduction of the statement, or suffer the consequences of having placed his character in issue. However, "a defendant does not put his 'character in issue' within the meaning of OCGA § 24-9-20 (b) by inadvertent statements regarding his own good conduct." *Jones v. State*, supra at 758. Even if we were to assume that the State, rather than the defendant, may introduce evidence of the defendant's good character in order to open the door for admission of evidence of bad character, we must conclude that appellant's pre-trial statement to police that others know he is not the kind of person to do such a thing was "an inadvertent statement regarding his own good conduct," and therefore cannot be the basis for admission of bad character evidence or for commentary on the

---

[9] It should be noted that, during cross-examination of appellant, the prosecutor tried several times to get appellant to give character evidence so that she could then get some of her own character evidence in. Each time, the trial court sustained defense objections to the questioning, at one time stating that the prosecutor was "walking a very narrow line at this point."

lack of good character evidence.

In the case at bar, appellant successfully defeated the State's attempts on cross-examination to have appellant open the character door. By permitting the State to comment during closing argument on appellant's failure to produce character witnesses, the trial court allowed the State to do what it forbade it to do during cross-examination of appellant — to make character an issue when appellant had not elected to make character an issue. By permitting the State to question the whereabouts of appellant's character witnesses, without appellant having put his character in issue, the trial court allowed the State to force upon appellant the need to prove he was of good character, a burden that has heretofore been a matter of choice for a defendant. See *Jones v. State*, supra at 755. I respectfully dissent.

DECIDED OCTOBER 4, 1993 —
RECONSIDERATION DENIED OCTOBER 29, 1993.

*Drew Findling, Anna Blitz,* for appellant.
*Lewis R. Slaton, District Attorney, Rebecca A. Keel, Leonora Grant, Assistant District Attorneys, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Peggy R. Katz, Staff Attorney,* for appellee.