## S00A1552. NGUYEN v. THE STATE.
(543 SE2d 5)

HINES, Justice.

Minh Nguyen appeals his convictions for felony murder, aggravated assault, aggravated battery, battery, and possession of a firearm during the commission of a crime in connection with the fatal shooting of Kim Standfill and the wounding of Thanh Nguyen. He challenges the admission of his non-custodial and custodial statements and the introduction of evidence of an attempt to influence the testimony of the surviving victim, Thanh Nguyen. Finding the chal-

lenges to be without merit, we affirm.[1]

At the time of the crimes, the victims, Kim Standfill and Thanh Nguyen, were living together and referred to each other as husband and wife. Minh Nguyen had been in the United States since 1979, and had known Thanh for 16 to 18 years. At one time, the two men were roommates, and Thanh had worked for Minh on a shrimp boat out of Savannah. By the time of the shootings, each man had his own boat from which each earned his livelihood.

Construed to support the verdicts, the evidence showed that on Friday, January 5, 1996, Minh played Chinese chess with Thanh at Thanh's home. The men did not fight or disagree that night, and Minh said he would return the next day to play again. However, Minh did not come to Thanh's home around noon the next day, as expected. That Saturday evening, January 6, 1996, Thanh and Kim went to sleep in the living room around 7:00 p.m. Between 9:00 p.m. and 10:00 p.m., Kim heard a knock, and told Thanh that someone was at the door. They asked who was there, and the reply was "Minh." Kim opened the door and Minh pushed it in and started shooting; Minh was wearing a red mask. He first shot Kim in the chest. Thanh held Kim and felt blood flowing from her chest. Kim went to the sofa and sat down. She attempted to smoke a cigarette, and she asked Minh, "Why are you shooting me and my husband?" Minh replied, "All of you have to die tonight." Kim's cigarette fell to the floor, and as she tried to retrieve it, she collapsed. Thanh bent down to pick Kim up, and Minh pointed his handgun at Thanh's head and fired. Thanh was shot in the shoulder and collapsed. Kim fell

---

[1] The crimes occurred on January 6, 1996. On March 19, 1997, a Chatham County grand jury returned a 12-count indictment against Minh Nguyen for: (1) malice murder; (2) felony murder while in the commission of the aggravated assault of Kim Standfill; (3) felony murder while in the commission of the aggravated assault of Thanh Nguyen; (4) aggravated assault of Kim Standfill; (5) aggravated assault of Thanh Nguyen; (6) aggravated battery of Thanh Nguyen; (7) possession of a firearm during the commission of the murder of Kim Standfill; (8) possession of a firearm during the commission of felony murder based upon the aggravated assault of Kim Standfill; (9) possession of a firearm during the commission of felony murder based upon the aggravated assault of Thanh Nguyen; (10) possession of a firearm during the commission of the aggravated assault of Kim Standfill; (11) possession of a firearm during the commission of the aggravated assault of Thanh Nguyen; and (12) possession of a firearm during the commission of the aggravated battery of Thanh Nguyen. On June 1, 1998, an order of nolle prosequi was entered on Counts 3 and 9. Minh Nguyen was tried before a jury and, on June 8, 1998, found guilty of battery as a lesser included offense of malice murder, and found guilty of the remaining charges. He was sentenced, by final disposition filed June 11, 1998, to life imprisonment on Count 2; a concurrent twenty years in prison each on Counts 4, 5, and 6; a consecutive five years in prison each on Counts 7 and 11; and twelve months in prison on Count 1 to be served concurrently with Counts 2, 4, 5, and 6. The court found the merger of Counts 8, 10, and 12 for the purpose of sentencing. A motion for new trial was filed on June 26, 1998, and was denied on February 8, 2000. A notice of appeal was filed on February 11, 2000, and the case was docketed in this Court on June 6, 2000. The appeal was orally argued on October 16, 2000.

onto a chair. Minh walked over and kicked Thanh around the neck and hit him six or seven times in the head with the handgun. Blood was "all over." While Thanh was on the floor, Minh walked around him to Kim and shot her three more times. Minh tried to fire his weapon again, but it was out of bullets. He then hit Kim on the wrist with the handgun. As Minh walked into the kitchen, Thanh got up and tried to run out the door, to "flee for [his] life," but Minh went after him and held Thanh down. The two men struggled; Minh fell "into" the television. Thanh got Minh's mask off, ran outside, and threw the mask in the grass. Thanh was screaming.

Thanh ran to Minh's brother-in-law's home nearby to call for help. Thanh was so bloody that the man would not let him in, but the man's wife called 911. It was then 10:40 p.m.

Thanh returned home to check on Kim, but she was not there. Police and paramedics arrived on the scene. They found Thanh injured and very upset. Thanh related that his wife was also injured and that he was trying to find her. Thanh was put into an ambulance. While in the ambulance, Thanh spied Minh and his wife, Dongh Nguyen, driving by in a reported "burgundy" vehicle. Minh drove a red Chevrolet.

When the police initially arrived at Thanh's house, the back door was open and there was no sign of Kim inside. Police found a red mask in the yard. After searching for about 20 minutes, the police found Kim outside nearby on the ground. She had no pulse, no respiration, and her pupils were dilated. Resuscitation attempts were made, but she was dead upon arrival at the hospital. Kim had sustained three gunshot wounds to the right side of her head and a gunshot wound to the top of the right shoulder next to the collarbone.

At 11:13 p.m., the police received a 911 call from Minh at his home; Minh related that he had shot somebody and needed the police to come for him.[2] As a result of this 911 call, Detective Robbins, who

---

[2] The tape of this call, which was played for the jury, contained the following:
Female Voice: [in Vietnamese] He hit me and gone. [Unclear] He came from behind.
Male Voice: [in Vietnamese] Say nothing. Last time he said [unclear].
Operator: 911 emergency, may we help you?
Male Caller: Yes, I call the police. I shoot somebody, you know, and need the police come get me.
Operator: You need what, sir?
Male Caller: I need the police come get me. I shoot somebody, you know.
Operator: You need the police come and get you for what, sir?
Male Caller: I shoot somebody.
Operator: You did what?
Male Caller: He tried to kill me. I shoot them.
Operator: Someone was trying to kill you?
Male Caller: Yeah.
Operator: Who tried to kill you, sir?
Male Caller: Uh . . . uh, from Savannah Garden. . . .

Operator: Who?

Male Caller: Uh, his name is Thanh, you know. He's a Vietnamese guy.

Operator: How did he try to kill you, sir?

Male Caller: Huh?

Operator: How did the guy try to kill you?

Male Caller: Uh, they come to my boat and they put a lotta things in my motor, you know, and kill my life, you know, and they just kill my [unclear] like that. They do so many times, you know.

Operator: Did they have any kind of weapon, sir?

Male Caller: I come to ask them why they do that and his wife tried to get the knife and kill me, you know, so I shoot them. That's it.

Operator: Do you know this person?

Male Caller: Yeah.

Operator: Who is it?

Male Caller: His name is Thanh.

Operator: Is he your brother? Your friend?

Male Caller: He is my friend, but . . . he like to do that, you know. He . . . [unclear]

Operator: So why do you want the police?

Male Caller: I want the police come get me to jail.

Operator: To come to what?

Male Caller: I gotta guilty.

Operator: You have a what, sir?

Male Caller: I have the guilty, you know. I shoot somebody, you know.

Operator: You shot someone?

Male Caller: Yeah, I shot them.

Operator: Okay. Where did you shoot someone at, sir?

Male Caller: I shot them at Savannah Garden and I live at, you know, at . . .

Operator: [Unclear] 10-4.

Operator: Okay. What is your name, sir?

Male Caller: My name is Minh Nguyen.

Operator: Your name is what? Go ahead.

Male Caller: Minh . . . Nguyen.

Operator: Hold on for me, okay?

Male Caller: Yeah.

Operator: [unclear] 17. Okay. Now, tell me how to spell your name, sir.

Male Caller: M-I-N-H.

Operator: Okay, M-I-N-S. What is your last name?

Male Caller: My last name is N-G-U-Y-E-N.

Operator: N-G-U-Y-E-N. Where are you now?

Male Caller: I'm at my house now.

Operator: You're at 1918 East 60th.

Male Caller: Yeah.

Operator: [unclear] What do you need to tell him? 10-4. Okay.

Operator: So you want to turn yourself in for killing someone.

Male Caller: Yeah.

Operator: So when did this happen?

Male Caller: I come to them house and ask them about they come to my boat and they try to, you know . . . my motor so many times, you know. It cost me a lot of money about that I meet them. I saw them coming to my boat last night, you know, and I don't think they do something wrong, you know. But today I check my boat, you know, and they put a lot of sugar in the motor, you know, and I come to his house and ask him about that. And his wife get the knife and try to kill me, you know. I got the gun so I shoot them.

Operator: Did this happen today?

Male Caller: Yeah, about a few minutes ago.

had been at the crime scene, was dispatched to Minh's home, about three miles away. Robbins was able to communicate with Minh in English; Minh responded to Robbins' questions and Robbins understood what Minh was telling him. Occasionally, Minh's son would clarify a word or phrase by speaking in Vietnamese to his father. Minh told Detective Robbins that he had been in a struggle with a man in Savannah Gardens and in the process the person he was struggling with was shot. Robbins knew that a woman had been involved in the incident at Savannah Gardens, but Minh never mentioned a woman. In fact, when Robbins asked Minh if a woman had been present, Minh denied it. Robbins then thought that Minh might have been involved in a different incident, so he asked Minh if he would ride with him and show police where the shooting occurred. Minh agreed, and he and his son rode together in the back of a police car. Minh identified Thanh's home as the place of the shooting. Detective Robbins then advised Minh of his *Miranda* rights; Minh's son repeated the rights in Vietnamese and Minh indicated that he understood. Robbins then transported Minh and his son to headquarters.

At headquarters, Robbins reminded Minh of his rights and again Minh indicated that he understood. Minh gave an audiotaped interview at which Minh's son assisted in translating when Minh had a problem understanding a question. Minh told police that: He went to Thanh's home to confront him about doing damage to the motor of Minh's boat; Thanh denied doing the damage and then grabbed Minh and pointed a handgun at him; Thanh hit him with the handgun; Minh and Thanh began to struggle over the handgun causing it to fall to the floor; Minh picked up the handgun and began shooting wildly around him; Thanh and Kim jumped him; Minh threw the handgun down and ran away. Minh denied knowing anything about a red mask.

At the conclusion of the statement, Detective Stover took over. Stover stated that he knew that Minh had been advised of his rights and that Minh said that he understood them. But he again advised Minh of his rights and Minh executed a waiver of rights. Minh then made another statement to Detective Stover, which substantially echoed his statements to Detective Robbins. A city employee, who spoke English and Vietnamese, was brought in, and Stover went over Minh's statement in the presence of the interpreter. The statement

---

Operator: Okay, where did this happen at?
Male Caller: At Savannah Garden.
Operator: Okay, at Savannah Garden. Okay, sir, we'll go ahead and send the police over there, okay?
Male Caller: Yes. Thank you.
Operator: You're welcome.

did not change.

After Minh was released on bond, he went to Thanh's home three or four times. Thanh tried not to speak with him, and Minh told him, "I just want to talk or negotiate." One evening, Minh came to Thanh's home with his wife and sons and asked Thanh to help him. Minh asked Thanh to lie in court and to tell the court that the handgun and mask belonged to Kim; in exchange, Minh would help Thanh buy a $12,000 boat by paying for half of it. The next day, Thanh contacted his lawyer and the district attorney about the incident. The police arranged to equip Thanh with a listening device in order to monitor and record Minh's statements. Thanh called Minh to set up another meeting with him and that conversation was recorded. The police saw Minh and his wife leave Thanh's house after the arranged meeting, and Minh admitted that he gave Thanh $110 at that meeting.

Police later monitored a conversation between Minh's wife and Thanh. In that conversation, Minh's wife made veiled threats and tried to convince Thanh to make a false statement on Minh's behalf.

1. The evidence was sufficient to enable any rational trier of fact to find Minh Nguyen guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Minh fails in his contention that the trial court erred in admitting evidence of his non-custodial and custodial statements.

(a) Minh maintains that his initial statement to Detective Robbins about the alleged struggle with Thanh and the shooting, although admittedly non-custodial, was "so lacking in indicia of reliability as to render it inadmissible for any purpose"; he further argues that the "probative value of this poorly translated statement was outweighed by the prejudice of allowing the State to use it to impeach [him] with regard to the minor details of his account of the shooting."

However, Minh did not object at trial to the admission of his initial statement on the grounds of poor translation and unreliability; therefore, these fail to provide bases of objection on appeal. *Alexander v. State*, 263 Ga. 474, 477, n. 6 (435 SE2d 187) (1993), citing *Reeves v. State*, 241 Ga. 44 (243 SE2d 24) (1978). His sole objection was that at the time of this statement, Detective Robbins had not advised him of any constitutional rights. But an individual is entitled to *Miranda* warnings only if taken into custody or deprived of freedom of action in a significant way. *McAllister v. State*, 270 Ga. 224, 227 (1) (507 SE2d 448) (1998). There is no contention or showing that that was the situation here, and Minh concedes that he was not in custody.

(b) Minh next asserts that after being advised of his *Miranda* rights, he made "a second unrecorded statement to Detective Robbins while in custody in the back of a patrol car." He maintains that the

court erred in admitting the statement because the *Miranda* warnings and his statement were translated by his son, who is not a certified translator and has only a limited understanding of Vietnamese; that he had difficulty understanding Detective Robbins' warnings regarding the right to counsel; that Robbins continued to question him after he stated that he wished to have an attorney but could not afford one; and that the probative value of the poorly translated statement was outweighed by the prejudice of allowing its use by the State. But the complaints are unavailing.

First, these complaints are not directed at the audiotaped statement to Detective Robbins made at police headquarters. They focus on what Minh characterizes as unrecorded comments made to Robbins in the patrol car and following the *Miranda* warnings, regarding the right to counsel: After giving Minh his rights, Minh responded that he could not afford a lawyer; so Robbins reiterated that the court would appoint one if Minh could not afford an attorney; Robbins asked Minh if he wanted to show him where the "gun" was or if he first wanted to talk to a lawyer; and Minh responded that he wanted to talk to Robbins. Minh argues that his responses demonstrate that he did not understand his right to counsel.

However, following a *Jackson-Denno* hearing, the trial court found, by a preponderance of the evidence, that the law enforcement officers were aware that Minh had a language difficulty, and accordingly, any questioning of Minh was done in the presence of his son, who gave the officers the impression that he was communicating with his father; that on each occasion that Detective Robbins spoke with Minh with respect to any testimony of an inculpatory nature, Robbins did so after having apprised Minh of his *Miranda* rights; that Minh understood those rights and that he voluntarily waived them after the officers went to some length to determine whether Minh understood the information given him; and that thereafter, Minh gave his statement freely and voluntarily without any hope of benefit or fear of injury.

A trial court's findings regarding factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal unless clearly erroneous. *Lee v. State*, 270 Ga. 798, 800 (2) (514 SE2d 1) (1999), quoting *Gober v. State*, 264 Ga. 226, 228 (2) (b) (443 SE2d 616) (1994). And after consideration of the totality of the circumstances, it must be concluded that the trial court correctly found that any inculpatory statements to Detective Robbins were voluntary and admissible. *Lee v. State*, supra at 800 (2).

Testimony at the *Jackson-Denno* hearing and at trial showed that Minh and his son agreed to ride with Detective Robbins to the scene of the shooting involving Minh, and when Robbins realized that he was dealing with the earlier reported incident at Savannah

Gardens, Robbins advised Minh of his *Miranda* rights. Robbins believed that Minh understood those rights; but to ensure this, Robbins instructed Minh's son to repeat what was said to his father in Vietnamese. Minh had lived in the United States since 1979, and his son was born and raised in the United States, and the son was obviously fluent in English. As for the son's command of Vietnamese, he had been speaking it since early childhood, and it was spoken in the home. What is more, when asked if he could speak Vietnamese and translate if his father had difficulty understanding, the son indicated to police that he would not have any trouble translating. At the *Jackson-Denno* hearing, Minh's son testified that he told his father in Vietnamese that he had the right to have an attorney present, that if he could not afford one, an attorney would be appointed, and that he had the right to remain silent, and that his father understood what he told him.

As for the taped statement to Detective Robbins: Minh's son was present and assisting at all times; there is no evidence that Detective Robbins ever threatened Minh or offered him any reward to speak with him; there is no evidence that Minh was denied use of the bathroom, food, or water; and Minh did not request an attorney or ask Detective Robbins to stop interviewing him.

(c) Minh also challenges his custodial statement to Detective Stover as a continuation of Detective Robbins' alleged illegal questioning, in that the interview should have ceased when it became apparent that he did not understand that he had a right to have an attorney present, or that he had a right to appointed counsel. Also, he asserts that at a crucial point in the conversation, immediately after Minh indicated that he desired to have his attorney, Minh's son made a critical error in interpreting and explaining Minh's right to counsel.[3] But the challenges fail.

First, the record supports the finding that Minh knew and understood his rights to have an attorney present and to have

---

[3] Minh refers to the following excerpt:

Minh: I don't want you to lose time, you know. I think you're good man with me. You can tell about it. Uh. I don't know what about how about [inaudible] with me. Didn't I just put yes.

Minh: [in Vietnamese] While ago he ask if I need a lawyer and can put yes, or no is that right?

Minh's Son: [in Vietnamese] Uh he asked if you know anything about the incident? If you understand then respond yes if you don't understand put no.

Minh: [in Vietnamese] OK. So put yes?

Minh's Son: Uh. Huh [inaudible] It is the address.

Minh: [in Vietnamese] [Inaudible]

Detective Stover: Uh, just make it check mark.

Minh: Right here?

Detective Stover: Uh huh. And put your initial here.

appointed counsel. See Division 2 (b). Second, prior to the statement to Detective Stover, Minh was again advised of his rights; with the help of his son, Minh executed a waiver of rights; and upon arrival of another interpreter, Detective Stover again went over Minh's statement with him to be certain that everything was understood correctly. Moreover, there was other evidence to support the trial court's finding that this statement also was freely and voluntarily made, and therefore, admissible. *Lee v. State*, supra at 800 (2). This included Minh's telephone call to 911; that Minh was instructed at least three times about the *Miranda* rights; that two different people who appeared proficient in Vietnamese and English were present at different times and assisted throughout the entire interrogation; and that Minh was able to respond in English in his conversations with the detectives.

Insofar as Minh now contends that he invoked his right to counsel while being questioned, the record does not show a clear or unambiguous request for counsel as would require the cessation of questioning under *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981). *Jordan v. State*, 267 Ga. 442, 444 (1) (480 SE2d 18) (1997). Also, contrary to Minh's assertion, the cited excerpt does not demonstrate that Minh's son made an error in explaining Minh's right to counsel and interpreting Minh's response. Examination of the entire dialogue shows that the son, as well as Detective Stover, clearly advised Minh of his right to counsel, and that Minh ultimately rejected having an attorney present.[4] Even if certain of Minh's responses were deemed to be unclear or ambiguous requests for counsel, the detective attempted to clarify such responses, and he continued to advise Minh, both orally and in writing, of Minh's rights to an attorney and to remain silent; but, Minh continued to initiate further discussion and proceed with the interview. *Jordan v. State*, supra at 445 (1).

---

[4] Immediately after the cited excerpt, Detective Stover again reminded Minh of his rights and inquired if Minh wished to then have an attorney:

Detective Stover: [Alright] and this said, having this rights in mind that I've read to you. Having all this in your mind. Do you wish to answer my questions now, without a lawyer here with you?

Minh: [in Vietnamese] [Inaudible]

Minh's Son: He is asking you father. Do you want to answer his questions or do you want to retain an attorney now? Do you want to respond to some of his questions now?

Minh: I [d]on't know. You can ask me and I'll tell you.

Minh's Son: He says you can ask him.

Detective Stover: OK and so you're saying yes. You'll answer any questions that I have.

Minh's Son: [in Vietnamese] He said.

Minh: Yes, you can ask, ask me.

3. Lastly, Minh fails in his contention that the trial court erred in allowing the State to introduce evidence of the attempt to influence Thanh's testimony. As Minh concedes, the State may introduce evidence of a defendant's attempt to influence a witness as consciousness of guilt by conduct. See *Ballard v. State*, 268 Ga. 895, n. 4 (494 SE2d 644) (1998); *Ross v. State*, 255 Ga. 1, 3 (2) (b) (334 SE2d 300) (1985). See also *Sabo v. State*, 226 Ga. App. 106, 108 (3) (b) (485 SE2d 591) (1997). And here, contrary to Minh's assertion, the State's evidence tended to show far more than merely an attempt by Minh and his wife to persuade Thanh to talk to Minh's attorney and to tell the truth. As to the claim that the probative value of this evidence was outweighed by its prejudice, it was for the trial court to exercise its discretion in determining admissibility, and no abuse of that discretion has been shown. *Carroll v. State*, 261 Ga. 553, 554 (2) (408 SE2d 412) (1991).

*Judgments affirmed. All the Justices concur.*

DECIDED FEBRUARY 5, 2001.

*Tom A. Edenfield, Eric R. Gotwalt,* for appellant.
*Spencer Lawton, Jr., District Attorney, Margaret E. Heap, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Daniel G. Ashburn, Assistant Attorney General,* for appellee.