S05A0446. BRIDGES v. THE STATE.
(613 SE2d 621)

SEARS, Presiding Justice.

Appellant Roy Bridges appeals his dual convictions for murder, resulting in life sentences, alleging that numerous errors by the trial court mandate a reversal.[1] Having examined the record, we conclude the trial court erred by admitting certain irrelevant evidence, but due to the overwhelming evidence of appellant's guilt, the error was harmless. We also find that appellant's allegations of ineffective assistance from trial counsel, though raised for the first time on appeal, are timely and must be remanded to the trial court. Having

---

[1] The crimes occurred on December 26-27, 1997, and appellant was indicted on March 16, 1999. Trial was held on February 28-March 7, 2000. Appellant was convicted of two counts of malice murder and sentenced to two consecutive life sentences. Trial counsel filed a motion for new trial on April 5, 2000. The motion for new trial was amended on July 25, 2002, and August 5, 2002, and was denied on August 21, 2003. Trial counsel filed a notice of appeal on August 28, 2003. Appellate counsel entered an appearance and amended the notice of appeal to include the denial of the new trial motion on September 19, 2003. On April 14, 2004, an extraordinary motion for new trial was filed, which the State moved to dismiss on June 10, 2004. On July 8, 2004, the trial court denied appellant's extraordinary motion for new trial and granted the State's motion to dismiss the extraordinary motion for new trial. Appellant's request for an out-of-time appeal from that decision was denied on August 30, 2004. The transcript was certified by the court reporter on November 2, 2004. The appeal was docketed on November 10, 2004, and was argued before the Court on March 21, 2005.

found no merit to appellant's remaining enumerations, we affirm and remand.

On December 27, 1997, the severely beaten body of appellant's wife, JoAnn Bridges, was found in the Whigham, Georgia, home of her mother, a butcher knife lodged in her chest. Upstairs lay the body of appellant's invalid mother-in-law, Christine Ulmer, her trachea cut open. Authorities soon determined the murders had occurred sometime after 10:00 p.m. the previous night. Although evidence initially indicated the murders may have been associated with a violent burglary, that theory was soon abandoned as no property appeared to be missing from the home.

When asked about his whereabouts on the night of the murders, appellant told investigators that he had been hunting near Opelika, Alabama, yet it was determined that he never checked into the hunting club where he claimed to have stayed.[2] Appellant told authorities that he was in Alabama from approximately 3:00 p.m. on December 26th until 5:00 a.m. on December 27th, and that he had made no phone calls on the night of the 26th. However, cell phone records revealed that shortly after 10:00 p.m. on that night, appellant placed a cell phone call that originated within ten to twelve miles of Arlington, Georgia, which is located approximately forty miles northwest of the crime scene.

On the same day the murders were discovered, appellant asked JoAnn Bridges' employer whether JoAnn had any financial benefits payable upon her death. Bridges later told his son-in-law that he was anxious to settle JoAnn's estate because he "needed that money." After his arrest and before trial, appellant asked a cellmate to kill two potential State witnesses and/or to assist appellant in crafting a false alibi. Moreover, investigators learned that shortly before the murders, appellant had begun an adulterous affair with Marcy Garvin, his previous wife, whom he asked to re-marry him. Appellant also asked a female friend to stage an adulterous scene with Garvin's husband in order to make a divorce easier to obtain — and more lucrative — for Garvin.

At trial, three witnesses testified that after his arrest, appellant told them how he had killed his wife and mother-in-law. Cooper, who was incarcerated with appellant, testified that appellant told him he had cut one of the women's throat and had beaten the other; that he had disposed of the murder weapons in the nearby Flint River; and that he was receiving more than $200,000 in insurance proceeds due

---

[2] Appellant later conceded to investigators that he had not stayed at the hunting club, stating instead that he had stayed at an Opelika motel located near the club.

to his wife's death. Thomas, who also was incarcerated with appellant, testified that appellant told him he had killed his wife and mother-in-law with a "slapjack"[3] and a knife. Another fellow inmate, Smith, testified that appellant told him he had planned the hunting trip as a ruse, then went to his mother-in-law's house where JoAnn admitted him inside; that appellant hit JoAnn in the head, then went upstairs and stabbed his mother-in-law; that appellant had staged the scene to look like a robbery; and that appellant would receive insurance proceeds for his wife's death. Much of this information had not been made public by authorities at the time the witnesses learned of it.

1. The evidence of record was sufficient to enable rational triers of fact to find appellant guilty of murder beyond a reasonable doubt.[4]

2. At trial, several audio tapes were introduced into evidence by the State. One of these tapes was a recording of appellant's interview with investigators, conducted shortly after the murders. Three other tapes were recordings of appellant and his cellmate Thomas, made after appellant's arrest and before trial.

During deliberations, the jury asked to listen to these tapes again. Over appellant's objection, the trial court sent the four tapes and a tape player to the jury room. Appellant contends that permitting the tapes to go to the jury room was a violation of the continuing witness rule, which provides that "it is error to allow a jury to take written or recorded statements into the jury room during deliberations unless those statements are consistent with the defendant's theory of the case."[5] As explained below, close examination of the tapes in this case reveals that they contained nothing that was inconsistent with appellant's theory of the case. Hence, while the standard practice is to bring the jury back into open court to rehear recorded evidence, in this particular instance allowing the tapes to go to the jury room was not reversible error.

Regarding the three recordings of appellant's conversations with his former cellmate Thomas, the tapes themselves do not refer to the murders or the allegations that appellant committed them. Rather, they concerned a scheme in which Thomas, after his release from jail on bond, sought to assist appellant in creating a false alibi that would place him in Alabama at the time of the killings. At trial, appellant readily admitted that he and Thomas had worked together to create the false alibi. Appellant also testified that at the time of the recorded

---

[3] A "slapjack" is described in the transcript as a leather thong or strap filled with lead.

[4] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[5] *Fields v. State*, 266 Ga. 241, 243 (466 SE2d 202) (1996). See *Lane v. State*, 247 Ga. 19, 20 (273 SE2d 397) (1981).

conversations, he believed that evidence was being fabricated against him, which motivated him to concoct the alibi, but that he later decided to abandon the plan altogether rather than commit perjury. Appellant also said that Thomas was the main instigator of the scheme.

We have reviewed these three tapes as well as the transcript, and (as explained above) the content of the recordings is entirely consistent with appellant's testimony and the elements of his defense. Accordingly, while the accepted practice is to bring the jury back into open court to rehear recorded evidence during deliberations,[6] allowing these three audio tapes to go to the jury room in this particular instance was not reversible error.[7]

Likewise, the recording of appellant's initial interview with investigators, in which he discussed his actions and whereabouts at the time of the murders, is entirely consistent with his testimony at trial as to what transpired during that time. Accordingly, allowing the jury to rehear that tape in the jury room during deliberations was not error, either.[8]

3. The trial court did not abuse its discretion by refusing to qualify appellant's witness as an expert on railroad gang violence. Acceptance or rejection of the qualifications of a proposed expert witness is within the sound discretion of the trial judge and will not be disturbed on appeal absent manifest abuse.[9] While the record shows that appellant's witness had spent time monitoring transient individuals and gangs who ride the railroads, the record does not clearly establish that he was an expert in the field of violent crimes perpetrated by such persons.[10] Thus, we cannot say the trial judge manifestly abused his discretion in refusing to qualify the witness.

4. At trial, appellant's former cellmate and State's witness Thomas[11] testified that he was not promised assistance with his criminal prosecution for automobile theft in exchange for his testimony against Bridges. After trial, however, Thomas sought habeas corpus relief in connection with his prosecution, alleging (among other things) that he was forced to assist the State by testifying

---

[6] See *Summage v. State*, 248 Ga. App. 559, 561 (546 SE2d 910) (2001).

[7] Accord *Lane v. State*, 247 Ga. at 21.

[8] We also note that even if the trial court had erred by permitting the four tapes to go to the jury room, the overwhelming evidence of appellant's guilt would render the error harmless. See *James v. State*, 275 Ga. 387, 388 (565 SE2d 802) (2002).

[9] *Jester v. State*, 250 Ga. 119 (296 SE2d 555) (1982).

[10] See *Goodman v. Lipman*, 197 Ga. App. 631, 633 (399 SE2d 255) (1990) (conclusory statements as to a witness' knowledge or familiarity in a particular art, skill or science are not probative in determining their qualifications as an expert; such determinations must be based on evidence of the witness' education, training or experience in the pertinent field).

[11] See Division 2, supra.

against Bridges in exchange for a promise to drop or reduce the auto theft charges. Based upon this allegation, appellant urges that a secret arrangement existed between Thomas and the State, which — if disclosed — would have enabled appellant to successfully challenge Thomas's credibility during trial.

We disagree. Nowhere in the record does Thomas recant his trial testimony. The assertions raised in Thomas's petition for habeas corpus relief amount to nothing more than hearsay allegations that an improper deal existed.[12] Moreover, the transcript reveals that appellant cross-examined Thomas extensively at trial, including questioning him about any possible deals with the State, and that Thomas testified no such deals existed. Hence, it is not evident that the State failed to disclose an arrangement to drop or reduce charges against Thomas in exchange for his testimony.[13]

5. The trial court erred by admitting evidence that appellant bribed a corrections officer to bring him nail clippers, a nail file and headache powder while he was in jail awaiting trial. The State contends that this evidence showed appellant's propensity to attempt to influence others to assist him with his defense. The evidence admitted, however, was wholly unrelated to the appellant's defense; to the contrary, it merely concerned appellant's desire for certain amenities while incarcerated. Accordingly, the evidence "was not relevant to the issues being tried"[14] and should not have been admitted. However, in light of the marginal value of this evidence to the State's prosecution, and in light of the overwhelming evidence of appellant's guilt, we conclude there is no substantial likelihood that this piece of evidence had any influence over the jury's decision. Thus, the error was harmless.[15]

6. The trial court did not err by admitting evidence that appellant attempted to influence his adult children's testimony by giving them money.[16]

---

[12] Hearsay, of course, is without any probative value. *Roebuck v. State*, 277 Ga. 200, 204 (586 SE2d 651) (2003).

[13] Appellant also alleges that the State arranged to help Thomas with a personal bankruptcy proceeding in exchange for his testimony. The record indicates that a bankruptcy attorney met with Thomas once while he was incarcerated, and also indicates that the meeting was arranged by the State. Thomas, however, does not allege in his habeas petition that this meeting was part of any deal made in exchange for his testimony.

[14] *Lewis v. State*, 279 Ga. 69, 74 (608 SE2d 602) (2005).

[15] See *McClure v. State*, 278 Ga. 411, 413 (603 SE2d 224) (2004).

[16] See *Nguyen v. State*, 273 Ga. 389, 398 (543 SE2d 5) (2001) (the State may introduce evidence of a defendant's attempt to influence a witness as consciousness of guilt by conduct).

7. The trial court did not err by admitting testimony regarding appellant's behavior following his wife's death, including his behavior at her funeral.[17] A lay witness is permitted to give her opinion as to a defendant's behavior, so long as it is based upon personal observation and the witness states the facts upon which an opinion is based.[18]

8. Appellant claims the trial court erred by allowing a telecommunications employee to give improper opinion and hearsay testimony about cellular phone tower use. Pretermitting the question of trial court error, we find that no harm resulted from the employee's testimony, as it was cumulative of separate and admissible testimony from a telecommunications engineer who was qualified as an expert.[19]

9. The following enumerations are waived on appeal because no contemporaneous objection was raised at trial:[20] (1) appellant's claim that the trial court erred by giving a pre-voir dire charge to the jury in appellant's absence; (2) appellant's claim that the substance of the pre-voir dire charge was harmful;[21] (3) appellant's claim that the trial court erred by allowing three references to appellant's interest in JoAnn Bridges' life insurance policy; (4) appellant's claim that the trial court erred by permitting an investigator to testify that although he could not be positive, based upon his experience he was inclined to believe the murder scene had been staged to appear as if a robbery had occurred; (5) appellant's claim that the trial court erred by admitting testimony that witnesses' lives had been threatened before trial; and (6) appellant's claim the trial court erred by admitting evidence that appellant offered to pay a female acquaintance to stage an adulterous affair with the husband of appellant's first wife in order to make a divorce easier for the first wife to obtain.

10. The trial court did not abuse its discretion by holding that it was without jurisdiction to entertain the issues raised in appellant's extraordinary motion for new trial.[22] The extraordinary motion was filed in the trial court approximately eight months after the notice of appeal was filed. The filing of the notice of appeal divested the trial

---

[17] We note that appellant raises this enumeration in reference to the testimony of six witnesses, but that objections were only raised during two witnesses' testimony.

[18] See *Hayes v. State*, 208 Ga. App. 627 (431 SE2d 430) (1993).

[19] See *Gay v. State*, 279 Ga. 180 (611 SE2d 31) (2005); *Rowe v. State*, 276 Ga. 800, 807 (582 SE2d 119) (2003).

[20] *Francis v. Francis*, 279 Ga. 248 (611 SE2d 45) (2005).

[21] We reject appellant's claim that the trial court had a sua sponte duty to withdraw the pre-voir dire charge to the jury. See *Decker v. State*, 139 Ga. App. 707, 709 (229 SE2d 520) (1976) ("Where . . . a [pre-evidentiary] charge is informative, accurate, and not prejudicial to the rights of the parties, then it is to be encouraged, not discouraged.").

[22] See note 1, supra.

court of jurisdiction,[23] and that court therefore was without authority to consider appellant's subsequently filed extraordinary motion.[24]

11. In considering appellant's claim that he did not receive effective assistance from trial counsel, we must first determine whether this claim was raised at the first practicable opportunity.[25] Even though this issue is raised for the first time on appeal, it was timely raised because appellant was represented by trial counsel until after the notice of appeal was filed.[26]

Appellant's claims of ineffective assistance allege that trial counsel erred by failing to object to: (1) appellant's absence from the courtroom during the pre-voir dire charge to the jury; (2) the substance of the trial court's pre-voir dire charge; (3) the State's three references to life insurance benefits; (4) the admission of evidence of Bridges' bad character, lay opinion testimony, and irrelevant evidence; and (5) improper argument by the State. Appellant also urges that trial counsel erred by failing to request a DNA analysis of the victim's fingernails, blood smears and swabs, rape kit, or any other bodily fluid evidence, and by failing to raise meritorious issues in the motion for new trial. Because we will not consider these claims until they have been presented to and passed upon by the trial court, we find that the issue of ineffective assistance of counsel must be remanded to the trial court for a hearing and a ruling.[27]

*Judgment affirmed and case remanded with direction. All the Justices concur, except Benham, J., who concurs in judgment only as to Division 2.*

DECIDED MAY 23, 2005.

*Spruell, Taylor & Associates, Billy L. Spruell, Melinda D. Taylor,* for appellant.

---

[23] *Holt v. State,* 205 Ga. App. 40 (421 SE2d 131) (1992).

[24] The record does not support appellant's claim that the trial court erred in denying his motion for an out-of-time appeal from the trial court's dismissal of his extraordinary motion.

[25] *Glover v. State,* 266 Ga. 183, 184 (465 SE2d 659) (1996).

[26] See *Hayes v. State,* 261 Ga. 439, 446 (405 SE2d 660) (1991). As noted above, appellate counsel was not appointed until after the notice of appeal was filed. See note 1, supra. The State points out that upon being appointed, appellate counsel filed a timely amended notice of appeal in order to ensure that the denial of appellant's motion for new trial was included in the appeal, and argues that because the amended notice of appeal did not allege the ineffective assistance of trial counsel, the issue is waived on appeal. We disagree. An ineffectiveness claim must be raised "at the earliest practicable moment"; meaning that the "claim [must] be raised *before appeal* if the opportunity to do so is available." (Emphasis supplied.) *Glover,* 266 Ga. at 184. In this case, because trial counsel represented appellant until after the notice of appeal was filed, there was no opportunity to raise the ineffectiveness claim before appeal. Hence, the issue is not waived.

[27] See *Glover v. State,* 266 Ga. at 184.

*Joseph K. Mulholland, District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General,* for appellee.