640 S.E.2d 587 (2006)
REVELLS
v.
The STATE.
Karklis
v.
The State.
Nos. A06A1540, A06A1541.
Court of Appeals of Georgia.
October 25, 2006.
Reconsideration Denied December 15, 2006.
*589 Clark C. Adams, Jr., Columbus, for appellant (case no. A06A1540).
James D. Lamb, Waycross, for appellant (case no. A06A1541).
J. Gray Conger, District Attorney, Ryan R. Leonard, Assistant District Attorney, for appellee.
ANDREWS, Presiding Judge.
Raymond Revells and his wife, Amanda Karklis, appeal from the trial court's denial of their motions for new trial following their convictions by a jury of three counts of cruelty to a child, L.R.,[1] Raymond Revells' then nearly four-year-old daughter.[2] Revells and Karklis both challenge the sufficiency of the evidence. Karklis additionally challenges a number of evidentiary rulings and argues that her trial counsel was ineffective. The cases have been combined for our consideration.
*590 "On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to support the verdict, and [Revells and Karklis] no longer enjoy[] a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility." (Citations and footnotes omitted.) Eady v. State, 256 Ga.App. 696, 569 S.E.2d 603 (2002).
So viewed, the evidence was that, in the summer of 2001, Randy Revells was living in Louisiana with L.R. and Jesse, Randy's son who was not fathered by Raymond Revells. At this time, nearly four-year-old L.R. was a normal, healthy child who had a healthy appetite and weighed about forty pounds. L.R. had long hair, did not have lice, and did not have any marks on her body. Raymond Revells and his then girlfriend Amanda Karklis came to Louisiana and, pursuant to the June 2001 Georgia divorce decree, obtained custody of L.R. and Jessie on October 31, 2001. Randy Revells did not see L.R. again until March 2002.
On March 5, 2002, L.R. was brought to the Medical Center in Columbus by Raymond Revells and Amanda Karklis. According to them, L.R. had suffered a seizure. Dr. Bucholtz, the on-call family practice physician, observed that L.R. was very lethargic, limp, and not interactive. She responded only to deep stimulus and her vital signs included a temperature of 94 which, according to Dr. Bucholtz, is as troubling as having a higher than normal temperature. L.R.'s hair was very unkempt and short, which was explained by the adults as the result of treatment for head lice. L.R.'s body was covered with marks and scabs and there was crusting around her nose and eyes. She was not breathing well and testing found that her carbon dioxide level was twice the normal level and very dangerous. As a result, she was intubated and placed on a ventilator. She was treated with numerous intravenous antibiotics for an overwhelming infection which could have been chicken pox or bacterial. L.R.'s weight upon admission was 28.6 pounds and she was described by one of the nurses who cared for her as looking like "a child that had come out of a concentration camp."
Raymond Revells told the doctor that L.R. had suffered a seizure starting on the left side of her body. He also reported that he had had a stomach virus and there were other children in the household who might have had chicken pox.
A CAT scan was conducted on L.R. and a subdural hematoma, blood between the skull and the brain, was found. A retinal hemorrhage was also found. Asked about, this, Raymond Revells said that, a couple of weeks ago, L.R. had been playing in the area of a tire swing and was hit in the head by it. According to him, it seemed inconsequential and he did not worry about it.
Dr. Michael Gorham, a neurologist at the Columbus Medical Center, consulted on L.R.'s case and surgery to relieve pressure on her brain was considered. Because she ceased actively seizing and began to awaken, however, the surgery was not necessary. According to Dr. Gorham, a subdural hematoma is something usually seen only following serious trauma to the head, such as a vehicle wreck or serious assault. He was never satisfied with the explanation given for her injury.
Dr. Bucholtz's diagnosis was respiratory failure, which can be caused by an overwhelming infection. He was also concerned that this was "a possible child-neglect scenario."
On the morning of March 6, Dr. Osma Ali, the family practice resident at the Columbus Medical Center, saw L.R. He also observed that she appeared underweight for her age and her muscle mass was also less than normal for her age. He observed that her head was shaved and she had multiple lesions on her body. Dr. Ali was also suspicious about possible neglect and spoke to Amanda Karklis. She told him that she and Revells had just obtained custody from Randy Revells, and L.R. had these lesions on her when they got her. Amanda Karklis also told two nurses that, when she and Raymond Revells got L.R. from her mother, she was in this condition. No history of diarrhea or abdominal pain was included in L.R.'s history.
*591 L.R. was later taken off the respirator and began to slowly improve. As she began to ingest normal food, nurses noticed that she would eat the food brought to her and immediately request more. L.R. would also request food between meals. Also, L.R. was hoarding food. Even though the nurses told her they would bring her anything she needed to eat, she was hiding food in the closet, her bedside table, and underneath her sheets. Nurse McKnight, a pediatric nurse for twenty-six years who had observed hundreds of children between the ages of three and five, described this hoarding behavior as very unusual for such a child.
On March 11, when L.R. was discharged, Nurse Holland went over the discharge instructions with Raymond Revells. Because of her seizure activity, L.R. had been receiving and was discharged on Phenobarbital. Revells was told that he needed to follow up on L.R.'s care with Dr. Janie Burgher-Jones, who had delivered L.R. and been her pediatrician the first year and one half of her life while she was with Randy Revells. Raymond Revells was also told to return to the Columbus Medical Center in three weeks so L.R.'s Phenobarbital level could be checked. Revells signed the discharge sheet, which stated that he had received and understood these instructions. Dr. Burgher-Jones was never called by Raymond Revells or Amanda Karklis regarding L.R.
Although a report concerning L.R.'s condition was made to the Department of Family and Children Services (DFACS) on March 7, the investigative procedures of the agency were not properly followed and the investigation was closed.
Randy Revells had returned to Columbus, become pregnant, and delivered her baby at Columbus Medical Center while L.R. was hospitalized there. She was told there was a child there with her last name and Randy went upstairs and saw L.R. and almost did not recognize the child. Nurse McKnight came in the room and found Randy Revells with L.R. on March 11. She asked L.R. who the woman was and L.R. identified her as "my mommy." McKnight observed the two hugging and talking face-to-face.
Similar transaction evidence was introduced regarding Amanda Karklis' daughter A.M. Karklis' mother, Regina Etheridge, babysat for weeks at a time for A.M. and Robbie Morse, two of Karklis' other children. She kept A.M. from the time she was two weeks old until she was eighteen months old. Karklis told Etheridge that A.M. was diabetic and that her diet was severely restricted. Every time Karklis brought A.M. to her, Etheridge described A.M. as "hungry and filthy." Also, she said A.M. was "severely starving. She would eat like I've never seen anybody eat in my life." Most of the time, A.M.'s head was shaved and, when asked why, Karklis said she had lice. Although Etheridge asked Karklis and Raymond Revells about any special diet or medication for A.M., she was never given any information about these issues. A.M. never had any reactions to any food which Etheridge fed her.
Barbara Caldwell, the mother of Karklis' former husband Edward Karklis, and a nurse, saw A.M. about once a week from the time she was two years old until she was placed in foster care. She described A.M. as slight and always hungry, with sparse and thin hair. As A.M. got older, her head was shaved. When she was with Caldwell, A.M. ate to the point her stomach would be distended and she would fall asleep in her chair. Amanda Karklis told Caldwell that A.M. was a picky eater and later told her she was diabetic. Once, Caldwell was at Amanda Karklis' home and saw A.M. in the corner where she stayed for four hours. Amanda Karklis told her that A.M. had been sent home from school because she was eating out of the garbage can in the lunchroom. Also, Caldwell observed Amanda Karklis tell A.M. to go to bed and A.M. walked into the closet. When Caldwell asked her what she was doing, A.M. replied "[m]e go [to] bed." Caldwell saw Amanda then lock A.M. in the closet, which she explained she did because A.M. was getting up in the night and taking food.[3]
*592 Betty Campbell, A.M.'s foster mother, said she was given no medications for A.M. when she came into her care and that A.M. was on a normal diet. She also saw Amanda Karklis give A.M. candy when she was visiting A.M. Campbell also briefly cared for L.R. and Jesse Revells, her brother. While they were watching television, Jessie got a picture of Raymond Revells and Amanda Karklis to show Campbell. When L.R. saw it, she said "[t]hey hurt me" and turned the picture over.
On April 10, 2002, L.R. was brought by Raymond Revells and Amanda Karklis to the emergency room of Columbus Medical Center. Dr. Singh found L.R. was barely breathing, taking only five or six shallow breaths a minute and her heart rate was too slow. L.R. required resuscitation and the staff immediately began trying to raise her blood pressure by administering intravenous fluids and put her on a ventilator. Dr. Singh did not notice any belly distention in L.R. Because L.R. was in very critical condition and the Columbus Medical Center did not have all the resources needed to treat her, the decision was made to transfer her to the pediatric intensive care unit at the Medical Center of Central Georgia in Macon. The tentative diagnosis by the Columbus doctors was respiratory arrest and septic shock.
When asked by Dr. Singh what had happened, Raymond Revells said that L.R. had a cough and runny nose for the last three days. She then developed a rash and within 20 minutes before bringing her to the hospital, her condition had worsened. According to Dr. Singh, respiratory arrest would have been beginning anywhere from several hours prior, up to 48 hours prior, to L.R.'s admission. Because of this fact and Revells' and Karklis' statements that her condition only worsened 20 minutes before they brought her in, Dr. Singh's initial diagnosis also included parental neglect.
Nurse Cogburn, coordinator of the transport team for the Macon hospital, took a team of another nurse, a respiratory therapist, and two paramedics with her in an ambulance to pick up L.R. in Columbus. It was not possible to airlift her due to inclement weather. L.R. was deemed very critical but stable when the team began the transport, but within five to ten minutes, her blood pressure began to drop and her carbon dioxide levels rose. According to Cogburn, of the 80 to 90 transports she had done, L.R. was the most critically ill patient she had seen. It became necessary to put L.R. on 100 percent oxygen and use a manual Ambu bag to breathe for her the entire trip back to Macon. Multiple drugs were also administered to try to keep her heart rate up. The team was met on the hospital dock by the director of the pediatric intensive care unit, Dr. Clark, a medical resident doctor, a pediatric critical care nurse, and a respiratory therapist.
Dr. Clark described L.R.'s condition upon arrival as "[j]ust about as close to being dead as you can be." Dr. Clark also noted sores in various stages of healing all over her body, including pressure sores on her buttocks, and found the muscle mass of her buttocks diminished. L.R.'s condition was so grave, Dr. Clark did not believe she would survive.
Over several days, the staff conducted numerous tests and the diagnosis of toxic shock syndrome, caused by a staph infection, was made. Staph was grown from swabs taken from L.R.'s nose as well as from several of the open sores on her body.
According to Dr. Clark, the condition in which L.R. presented was several days into the development of toxic shock syndrome and "this wasn't a one-day illness." When he talked to Revells and Karklis about L.R., they told him L.R. had been congested for a couple of days and then she became suddenly sicker and began to refuse to eat or drink. While in the kitchen, L.R. became unresponsive and they took her to the emergency room. Dr. Clark found this explanation implausible.
According to the testing done, Dr. Clark said the type of staph which L.R. had was that encountered in the community, not the more virulent type contracted in a hospital setting.
In Dr. Clark's opinion, L.R.'s malnourished condition caused a decreased resistence to infection. He also opined that, if a child lost fourteen pounds over a four-month period, medical attention should have been sought. *593 Further, he was of the opinion that the delay in seeking treatment for the child worsened her condition.
L.R. remained in the pediatric intensive care unit for at least ten days and was taken off the respirator after about two weeks. She began to improve and one of the critical care technicians, Stacy Frost, was with L.R. a great deal of the time attending to her needs. She was able to observe L.R. when Karklis was in the room and noted that L.R. would not move or say a word when Karklis was present. It was almost like she was frozen. Frost also spoke with Revells about L.R.'s condition and he told her that L.R.'s real mother abused her.
The nurses caring for L.R. noticed that her behavior changed during her hospitalization in Macon from being shy, withdrawn, and skittish to smiling, interacting with staff, and needing attention. Also, while hospitalized, L.R. was fed a normal diet when she began to eat again and she gained weight on it.
Ashley Cox, a DFACS child protective services investigator, received a request from the Columbus office to investigate L.R.'s situation. She went to Macon and spoke with Revells who told her that L.R. had been acting groggy and not eating. He also said that, just prior to taking her to the emergency room, L.R. would not wake up and was ice cold. In Macon, pediatric social worker Richard Webb also spoke with Revells and asked about all the sores and bruises on L.R.'s body. Revells said they were all self-inflicted or accidental. Revells also told him that L.R. was lice infested, thin, withdrawn, and in bad shape when he and Karklis got her back from her mother.
Laurie Davis, an investigator with the DFACS, interviewed Raymond Revells on April 16 at the hospital in Macon. She asked him to explain what happened. He told her that L.R. had been fine until the morning of April 10, except she did not have much appetite, which he said was not unusual. He said L.R. had lain down for a nap and Karklis came to him about 30 to 45 minutes later and said L.R. was very cold to the touch. When he could not wake her, they took her to the hospital. Davis also interviewed Karklis later the same day in Columbus. Karklis said L.R. had been fine the 24 to 48 hours before she was taken to the hospital. The morning of April 10, she did not want to eat and was very sleepy. When Karklis went to check on her about 30 to 45 minutes later, she was "cold as a Popsicle." That is when L.R. was taken to the hospital.
Because of L.R.'s debilitated condition, she was transferred to Scottish Rite Children's Hospital in Atlanta for physical, occupational, speech and play therapy. She was unable to communicate or get around at the level of a normal four-year-old and needed a wheelchair when she first arrived. According to Dr. Michael Johnson who treated her there, L.R. was fed a normal diet while at Scottish Rite and she gained weight while she was there.
According to Dr. Burgher-Jones, L.R.'s pediatrician her first year and a half, L.R. was always average to above average in size while living with Randy Revells. L.R. was brought in by her mother for all her checkups, and at 11 months old she weighed 21 to 22 pounds. Also, Dr. Burgher-Jones indicated that a normal child should begin eating solid food at about six months of age and that it would be absolutely inappropriate to feed a four-year-old formula, which is what L.R. indicated she had been fed by Raymond Reyells and Karklis.
After being returned to her mother, Randy Revells, in January 2003, following a period in foster care, L.R. was initially diagnosed in February 2003, and confirmed in March 2003, with celiac disease, an hereditary disease which causes malabsorption of food in the digestive tract because the body does not digest gluten properly. Although Raymond Revells and Karklis attributed L.R.'s weight loss while in their care to this disease, Dr. Burgher-Jones opined that this disease would not cause a child to loose fourteen to sixteen pounds over a four-month period. Further, feeding a child with celiac disease a regular diet should not cause the child to gain weight, as L.R. did during her hospitalizations and while she was in foster care. According to Randy Revells, at the time of *594 trial in September 2003, L.R. weighed 44 pounds.
Raymond Revells' grandmother, Mamie Woodell, attended a family reunion in Columbus during Thanksgiving 2001, shortly after L.R. had been returned to Raymond's custody. She described L.R. as looking good at that time, with pretty long hair. She noticed no cuts, bruises, or sores on the child.
Deborah Thompson, L.R.'s social worker at Georgia Agape, the foster care organization through which L.R. was placed, supervised a visit between Raymond Revells and L.R. while L.R. was in foster care. While L.R. was glad to see him, when he began to talk about how Karklis loved her, L.R. said "no. She hurt me. I don't like her. She's mean."
Dr. Randy Alexander testified as an expert witness in the areas of pediatric medicine and child abuse and neglect. Dr. Alexander reviewed the medical records of both of L.R.'s hospitalizations. In his opinion, L.R., as a result of inadequate nutrition, was suffering from "failure to thrive" and abusive head trauma when admitted in March 2002. Based on his review of the CAT scans, he opined that the injury resulting in the hematoma was zero to seven days old, not two weeks as stated by Raymond Revells. Further, in his opinion, at the time of the injury, the child would have exhibited immediate symptoms, such as unconsciousness and vomiting. Finally, Dr. Alexander opined that being hit by a tire swing two weeks prior would not have caused the damage he saw.
Dr. Alexander was also of the opinion that celiac disease did not cause L.R. to be in the condition she was in in March or April 2002. Also, according to Dr. Alexander, the explanation given by Raymond Revells and Karklis regarding L.R.'s being fine 45 minutes before being found ice cold was not possible.

Case No. A06A1540
1. Raymond Revells' sole enumeration of error contests the legal sufficiency of the evidence.
A person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain. OCGA § 16-5-70(b). For the purposes of this Code section, malice "imports the absence of all elements of justification or excuse and the presence of an actual intent to cause the particular harm produced, or the wanton and wilful doing of an act with an awareness of a plain and strong likelihood that such harm may result." (Citation omitted.) Hill v. State, 243 Ga.App. 614, 616, 533 S.E.2d 779 (2000).
Here, evidence showed that Revells took custody of a healthy normal weight three-and-a-half-year-old on October 31, 2001, and by March 5, 2002, she was very ill and had lost fourteen pounds. Having been told upon her discharge to return for testing and to contact her regular pediatrician, Revells did neither and took no steps to seek medical attention until, on April 10, L.R. was almost dead. Such is sufficient to enable a jury to conclude that he acted wilfully and wantonly, aware of the harm to his daughter that would result from his neglect. Gore v. State, 277 Ga.App. 635, 636(1), 627 S.E.2d 198 (2006); Wolf v. State, 246 Ga.App. 616, 618(2), 540 S.E.2d 707 (2000); see also Glenn v. State, 278 Ga. 291, 293-294(1)(a), 602 S.E.2d 577 (2004) (intentional and unjustifiable delay in obtaining necessary medical attention for child constitutes "malice" for purposes of the child cruelty statute).
Further, the evidence clearly shows that, when L.R. was fed, despite her claimed celiac disease, she thrived and gained weight. It was only when she was with Revells and Karklis that she became an emaciated waif.
Revells' alternative theory of who caused L.R.'s condition "[was] presented to and rejected by the jury." O'Donnell v. State, 258 Ga. 782, 783(1), 374 S.E.2d 729 (1989). Similarly, his contention that the sores on her body were not as severe as portrayed by the testimony of medical personnel, based on photos in evidence, was also argued to and considered by the jury.
Where there is conflicting evidence, it is solely within the purview of the jury to weigh the evidence and decide upon the credibility of the witnesses. As long as there is some competent evidence, even if contradicted, to support the facts necessary *595 for the State's case, the jury verdict will be upheld. Ellison v. State, 233 Ga. App. 637, 504 S.E.2d 779 (1998); Williams v. State, 231 Ga.App. 123, 125(2), 497 S.E.2d 660 (1998).
Brown v. State, 239 Ga.App. 794, 521 S.E.2d 925 (1999).
We conclude that there was sufficient evidence for a rational trier of fact to find Revells guilty beyond a reasonable doubt of cruelty to L.R. by failing on two occasions to provide necessary and appropriate medical care and by depriving her of nourishment. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Gore v. State, supra.

Case No. A06A1541
2. Karklis' first three enumerations of error also challenge the sufficiency of the evidence. As we did with Revells, we find that there was sufficient evidence for a rational trier of fact to find Karklis guilty beyond a reasonable doubt of these charges. Jackson v. Virginia, supra; Gore v. State, supra.
3. In her fourth enumeration, Karklis contends the trial court erred in allowing Dr. Bucholtz to give an opinion as to an ultimate fact, based on Allison v. State, 256 Ga. 851, 853(6), 353 S.E.2d 805 (1987).
Dr. Bucholtz was asked on direct examination for his assessment or diagnosis of L.R. following his examination and testing. He responded that she was in respiratory failure, which can be caused by an overwhelming infection such as meningitis. The infection could also have caused the seizure. Dr. Bucholtz then stated "[a]nd my overall impression was a possible child-neglect scenario."
Defendants' counsel objected that the doctor had given his opinion of "child-neglect syndrome" without foundation and that he expressed his opinion on the ultimate question of whether the child was neglected. The trial court ruled that the doctor was qualified as an expert and could give his opinion.
Initially, we note that Dr. Bucholtz did not testify concerning child-neglect syndrome, but described a possible "scenario." Also, where a syndrome has been recognized, such as child sexual abuse syndrome, expert testimony concerning it is admissible. Allison v. State, supra at 852(2), (3), 353 S.E.2d 805.
Nor did Dr. Bucholtz make any statement similar to that found inadmissible in Allison v. State, supra, where the psychologist opined that in her professional opinion, the child "had been [sexually] abused." Id. at 853(6), 353 S.E.2d 805.
A treating physician can testify that the examination of the child raised a "strong suspicion of child abuse." (Punctuation omitted.) Thornton v. State, 264 Ga. 563, 571(11), 449 S.E.2d 98 (1994). See also Harris v. State, 279 Ga.App. 570, 571, 631 S.E.2d 772 (2006) (Examining pediatrician testified that his findings were consistent with a finding of molestation.).
There was no error.
4. Karklis' fifth enumeration is that the trial court erred in allowing Laurie Davis, an investigator with the Department of Human Resources, to give opinion evidence.
The argument made here is that Davis' statement, based on her own investigation, that all children be removed from the Revells/Karklis home and "that medical neglect be substantiated regarding [L.R.]" was improper opinion evidence.
The objection made below, however, was that this statement was based on actions taken by a group of people and recommendations made by a group of people not present in court.
This assertion is waived on appeal because no such objection was raised below. Bridges v. State, 279 Ga. 351, 356, 613 S.E.2d 621 (2005).
5. Karklis, in her sixth enumeration, argues that the trial court improperly allowed nurse Joyce Saville to testify concerning her decision to report the March incident to DFACS, contending that this was not relevant.
Saville served as the pediatric case manager, in charge of any social issues which would *596 impact a child's life, such as whether the family had insurance, a regular doctor, working utilities, "and any issues that might involve DFACS."
A portion of the argument made here was not the subject of the objection below and is therefore waived for purposes of appeal. Bridges v. State, supra.
As for the relevancy objection, the evidence was relevant to explain the course of conduct of the hospital regarding L.R.'s care and future well-being. The trial court has wide discretion in determining relevancy and materiality and, where relevancy is doubtful, evidence should be admitted and its weight left for the determination of the jury. Owens v. State, 248 Ga. 629, 630, 284 S.E.2d 408 (1981).
We find no error.
6. In her seventh and eighth enumerations, Karklis contends that the trial court improperly allowed hearsay testimony by Laurie Davis, investigator, and Deborah Thompson regarding statements made by L.R.
(a) On May 28, 2002, while L.R. was hospitalized at Scottish Rite for rehabilitation, Laurie Davis of DHR and Sergeant McNeal interviewed her. The interview was audiotaped and the tape was played for the jury.
Karklis argues that the State failed to show sufficient indicia of reliability for admitting L.R.'s statements under OCGA § 24-3-16, the Child Hearsay Statute, which provides that
[a] statement made by a child under the age of 14 years describing any act of . . . physical abuse performed with or on the child by another . . . is admissible in evidence by the testimony of the person or persons to whom made if the child is available to testify in the proceedings and the court finds that the circumstances of the statement provide sufficient indicia of reliability.
"The trial court has broad discretion in determining the admissibility of child hearsay evidence, and we will reverse a trial court's ruling on the admissibility of statements under OCGA § 24-3-16 only if the trial court abused its discretion." (Citation and punctuation omitted.) Fiek v. State, 266 Ga.App. 523, 524(1), 597 S.E.2d 585 (2004).
In Gregg v. State, 201 Ga.App. 238, 240(3)(b), 411 S.E.2d 65 (1991), this Court set forth ten factors to be considered when determining whether a child's out-of-court statement provides sufficient indicia of reliability. These factors include: (1) the atmosphere in which the statement is made; (2) the spontaneity of the statement; (3) the age of the child; (4) the child's general demeanor; (5) the child's physical or emotional condition; (6) any threats or promises made to the child; (7) the presence or absence of drugs or alcohol; (8) the child's general credibility; (9) any coaching by parents or other parties; and (10) the consistency between repeated out-of-court statements by the child. Id. However, we warned that "[t]hese factors are to be applied neither in mechanical nor mathematical fashion, but in that manner best calculated to facilitate determination of the existence or absence of the requisite degree of trustworthiness." Id. at 241(3)(b), 411 S.E.2d 65. Moreover,
while the trial court must find that the circumstances of the child hearsay statement provide sufficient indicia of reliability, such finding is not a condition precedent to the admissibility of the statement; rather, this statutory requirement is met if after both parties have rested, the record contains evidence which would support such a finding.
(Citation and punctuation omitted; emphasis in original.) Baker v. State, 252 Ga.App. 238, 241(1)(b), 555 S.E.2d 899 (2001).
Here, Laurie Davis testified that L.R. was happy during the interview and was able to communicate with her and Sgt. McNeal. Davis noted that L.R. responded to the questions asked and that she was very inquisitive during the interview. Neither Davis nor McNeal made any promises or threats to L.R. Davis and McNeal were thoroughly cross-examined by defense counsel regarding L.R.'s reliability. Following defense counsel's objection that there was no indicia of reliability, the trial court listened to the audiotape and concluded there had been no *597 excessive coaching or planting of information and found sufficient indicia of reliability.
We find no abuse of the trial court's discretion. Here, L.R., who did not testify at the trial, was available for cross-examination by defense counsel concerning her claimed memory lapses and confusion, but counsel chose not to do so. See London v. State, 274 Ga. 91, 93(4), 549 S.E.2d 394 (2001).
(b) Deborah Thompson was the social worker for the organization that arranged foster care for L.R. following her release from the hospital. As such, she oversaw visitation between Revells and L.R. at the organization's office. During one such visit, Thompson observed that L.R. was glad to see her father, but when he began talking about Karklis, L.R. became upset. According to Thompson, Revells said "your momma (referring to Karklis) loves you." In response, L.R. said "no. She hurt me. I don't like her. She's mean."
Although the trial court did not hold a separate hearing on the indicia of reliability regarding this statement of L.R., we find such indicia. Baker v. State, supra. Here, the child was with a parent in a comfortable, non-threatening environment. The statement was not made in response to any inquiry, but was a spontaneous reaction to something said by Revells.
We find no error.
7. Karklis' remaining seven enumerations allege that she was denied her constitutional right to effective assistance of counsel because trial counsel failed to object to hearsay testimony from the State's witnesses Betty Campbell, Corey Mobley, and Tim Mobley; improperly brought out testimony regarding L.R. being burned with a cigarette; by not allowing Karklis to testify; by failing to call A.M.'s doctor to testify; and by failing to ask for a mistrial based on an incident occurring in the presence of the jury. They are considered together.
To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficiency so prejudiced defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); (cit.). The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. (Cit.) The trial court's findings with respect to effective assistance of counsel will be affirmed unless clearly erroneous. (Cit.)
(Citation omitted.) Patel v. State, 279 Ga. 750, 751, 620 S.E.2d 343 (2005).
(a) Regarding the testimony of Betty Campbell, trial counsel did make an objection which was overruled. That appellate counsel might have made a different objection does not make trial counsel's choice ineffective assistance. "The fact that [Karklis] and present counsel now disagree with the difficult decisions regarding trial tactics and strategy made by trial counsel does not require a finding that [Karklis] received representation amounting to ineffective assistance of counsel." (Citation and punctuation omitted.) Porter v. State, 243 Ga.App. 498, 502-503(4), 532 S.E.2d 407 (2000).
(b) Corey Mobley, L.R.'s foster parent, testified that L.R. told her she slept in a bathroom at times and that she and A.M. slept in a locked room; that once, after seeing Karklis, L.R. said she thought Karklis was going to hurt her; and L.R. said she was hit with the metal end of a belt.
Karklis contends that failure to object to these hearsay statements constitutes ineffective assistance. Karklis, however, cites no authority in support of this enumeration and acknowledges that none of these statements related to any of the charges of which she was convicted. Nor has she shown how, but for the failure to object, the result of the trial would have been different.
(c) Karklis' argument regarding statements made by L.R. to Tim Mobley, her foster father, suffers from the same failings and no error has been shown.
(d) During cross-examination of Dr. Burgher-Jones, L.R.'s pediatrician, defense counsel asked if she had seen anything in the medical records regarding L.R.'s being *598 burned. Karklis cites this as an example of ineffective assistance. The entire exchange was:
Q. . . . And did you see anything in the record about the child being burned in anyway?
A. Yes, I do recall seeing that.
Q. Where was that?
A. . . . That I don't remember. I think what I read about was something about cigarette burns.
Q. . . . That was something about talking about it.
A. Okay.
Q. Do you recall anyone finding a cigarette burn on this child?
A. I'm not aware of that.
Q. Not aware of anybody finding a cigarette burn?
A. I don't know.
Although Karklis was charged originally with one count of child cruelty by burning L.R. with a lighter, that count was dead docketed prior to trial, as acknowledged by Karklis. This evidence had nothing to do with the counts on which Karklis was convicted. Although Revells and Karklis were both charged with aggravated assault by striking L.R. in the head and causing the subdural hematoma, they were acquitted by the jury of that charge.
Therefore, no showing has been made that, but for the challenged evidence, the result of the trial would have been different.
(e) Karklis argues that trial counsel was ineffective for not allowing her to testify in her own defense.
Both Revells and Karklis were represented by the same attorney at trial. Although there is no transcript in the record here, there was a hearing prior to trial regarding this dual representation. Karklis acknowledged during the hearing on her motion for new trial that she testified at that earlier hearing that she did not have any problem with the dual representation and any conflicts which might arise.
According to trial counsel, he, Revells, and Karklis jointly discussed the issue of which of them should testify. Counsel was of the opinion that Revells would make a better witness and there would be less to cross-examine him about. Therefore, he suggested that Karklis should not testify. Although he could not specifically recall telling Karklis, counsel's normal practice was to advise clients that they had the right to testify.
Although Karklis testified that she expressed to counsel her desire to testify, she acknowledged that she did not insist on her right to testify and raised the issue only later in her motion for new trial.
We agree with the trial court that Karklis followed counsel's advice regarding her not testifying, not that he improperly prevented her from doing so. See Woods v. State, 275 Ga. 844, 845(2), 573 S.E.2d 394 (2002); Keen v. State, 164 Ga.App. 81, 82(1), 296 S.E.2d 91 (1982).
(f) Karklis contends that trial counsel was ineffective for not calling as a witness Dr. Panvelkar, A.M.'s doctor.
Karklis concedes that trial counsel interviewed Dr. Panvelkar and thereafter made a decision not to call her as a witness. Therefore, the trial court was authorized to conclude that this decision was due to reasonable trial strategy and not ineffective assistance. Styles v. State, 279 Ga. 134, 136(4), 610 S.E.2d 23 (2005); Shannon v. State, 275 Ga.App. 550, 551(1), 621 S.E.2d 540 (2005).
Further, no showing was made of what Dr. Panvelkar's testimony would have been. In determining the prejudicial effect of counsel's failure to call a witness, a defendant must make an affirmative showing that specifically demonstrates how counsel's failure affected the outcome of his case. Letson v. State, 236 Ga.App. 340, 341(2), 512 S.E.2d 55 (1999). Trial counsel's failure to call a witness cannot be deemed "prejudicial" without a showing that the witness's testimony would have been relevant and favorable to the defendant.
(g) Finally, Karklis contends trial counsel was ineffective for not seeking a mistrial based on an incident in which a juror saw prosecutors covering L.R.'s eyes as she walked by Karklis.
*599 Trial counsel did bring the incident to the court's attention and request that it not reoccur.
Karklis has cited no authority for the proposition that failure to request a mistrial in this situation was ineffective assistance and we find this argument waived. Welch v. State, 263 Ga.App. 70, 72(3), 587 S.E.2d 220 (2003); Court of Appeals Rule 25(c)(2).
Judgments affirmed in Case Nos. A06A1540 and A06A1541.
BARNES and BERNES, JJ., concur.
NOTES
[1] In Count 1, Revells and Karklis were accused of causing the child excessive physical pain by failing to provide necessary and appropriate medical care for her between November 1, 2001 and March 5, 2002. Count 2 charged them with the same offense for the period between March 11, 2002 and April 10, 2002. Count 4 charged them with depriving the child of nourishment between November 1, 2001 to March 5, 2002, to the extent her well-being was jeopardized.
[2] Randy Revells, L.R.'s mother, was previously married to Raymond Revells.
[3] L.R. would later tell her foster mother that she had to sleep in the bathroom and that sometimes she and A.M. would be locked in a room.