S08A1775. BERRYHILL v. THE STATE.
(674 SE2d 920)

HINES, Justice.

Lloyd Arthur Berryhill ("Berryhill") appeals his convictions for felony murder and aggravated assault in connection with the death of his infant son, Jonathan Peyton Berryhill ("Peyton"). For the reasons that follow, we affirm.[1]

1. Berryhill asserts that the evidence was insufficient to support

---

[1] Peyton died on October 29, 2004. On June 19, 2006, a Ben Hill County grand jury indicted Berryhill for: Count 1, malice murder; Count 2, felony murder while in the commission of cruelty to a child on October 25, 2004; Count 3, felony murder while in the commission of aggravated assault on October 25, 2004; Count 4, cruelty to a child during the

his convictions, contending that the State presented only circumstantial evidence that did not exclude all reasonable hypotheses except that of his guilt. See OCGA § 24-4-6.

> [Q]uestions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law. [Cit.]

*Robbins v. State*, 269 Ga. 500, 501 (1) (499 SE2d 323) (1998).

Construed to support the verdicts, the evidence showed that Peyton was born on August 11, 2004 to Berryhill and his wife, Maralie; they had married on April 30, 2004. In early October 2004, Peyton was left in Berryhill's sole care for the first time; when Maralie called Berryhill, he told her that Peyton choked while eating and Berryhill had to push on the infant's chest to get the blockage out. The next day, Peyton whined whenever he was moved, and a day or two later, Berryhill called Maralie's attention to a spot on Peyton's rib cage where a rib appeared to be protruding. The couple took Peyton to the emergency room where he was diagnosed with a bruised rib. A week or two later, Peyton was taken to a physician because of an eye condition that was diagnosed as conjunctivitis.

Sunday, October 24, 2004, was Berryhill's birthday. After a gathering at his home, he took Peyton to the bedroom to sleep; Maralie remained downstairs watching television with Lexie, her two-year-old daughter from a prior relationship, and fell asleep. She awoke at 5:30 a.m. to hear Peyton crying, and Berryhill soothing him, and returned to sleep. At 7:30 a.m., Berryhill awakened her to tell her that he had to go to work, and left the house. Maralie took Lexie upstairs and laid her, still sleeping, on the same bed as Peyton, with a pillow between them. Peyton was wearing only a diaper and appeared to be sleeping. Maralie took a shower and, as she was

period of October 1-14, 2004; and Count 5, aggravated assault during the period of October 1-14, 2004. Berryhill was tried before a jury April 11-13, 2007 and acquitted of Counts 1 and 4; he was found guilty of all the other crimes for which he was charged. On April 19, 2007, Berryhill was sentenced to life in prison for felony murder while in the commission of cruelty to a child, and a concurrent term of 20 years in prison for aggravated assault; the count of felony murder while in the commission of aggravated assault merged with the count of felony murder while in the commission of cruelty to a child. See *Malcolm v. State*, 263 Ga. 369, 372-374 (5) (434 SE2d 479) (1993). Berryhill moved for a new trial on April 20, 2007, and amended the motion on April 7, 2008. The motion was denied on April 30, 2008, and Berryhill filed a notice of appeal on May 28, 2008. The appeal was docketed in this Court on July 10, 2008, and submitted for decision on September 1, 2008.

drying her hair, her mother, Elaine Hutto, arrived and Maralie let her in. Ms. Hutto began to change Peyton's diaper, and he "went stiff as a board [with] his arms straight out and his legs went straight up and he was holding his head up like a six-months-old baby and his eyes were going in the back of his head." Ms. Hutto telephoned her husband, Benny Hutto, and Maralie telephoned Berryhill. When Mr. Hutto arrived at the house a few minutes later, he drove the women and two children to the hospital. Berryhill went into his employer's office and stated that he had to leave because Peyton had been taken to the emergency room; in response to a query as to what happened, Berryhill replied: "I don't know, unless I rolled over onto him in my sleep." Berryhill speculated in a similar vein to another co-worker.

Berryhill arrived at the hospital shortly after Peyton and the other family members. Peyton was later taken to a hospital in Macon, with Berryhill and the rest of the family following. There, Berryhill asked a physician if there was "a possibility that he might have rolled over on Peyton in the middle of the night," and whether the physician had heard of people who experienced blackouts. While Peyton was in the hospital's intensive care unit, Berryhill would not sleep in the room with him. He told an investigating law enforcement officer that: "if Peyton dies, I'll have to go . . . too."

Peyton died on October 29, 2004. While friends and relatives gathered at the Berryhill home to express condolences, Berryhill told Maralie he was going "partying," and asked if she wished to join him; she did not, and he left. During the "visitation," Berryhill did not stay by the casket, but went outside the building with friends, bouncing a ball and "laughing and joking." During the funeral, he stated he would be glad when "all of this was over with because he needed to go fishing"; as he walked by a funeral attendee, he "bowed up like he wanted to fight." The sleeper that Peyton was wearing the night before his death was found under the bed, stained with pinkish mucus.

The medical examiner testified that: Peyton died of massive closed head trauma complicated by blunt force chest trauma; he suffered broken ribs two to three weeks prior to his death; the "violent squeezing" necessary to accomplish this showed much greater force than that which would be used if trying to perform a Heimlich maneuver on an infant; there were healing bruises on Peyton's head, shoulder, hips, thighs, and abdomen; there was evidence of both recent brain injury and pre-existing brain hemorrhage; Peyton had likely been shaken violently; within "seconds to minutes" of the fatal injuries, Peyton would have experienced symptoms that included "laying there kind of stunned"; and Peyton could have gone into a seizure if stimulated by picking him up.

While incarcerated, Berryhill sent letters to Maralie, which contained the text: "I miss my son more & more every day and the only way to change that is to ask him to take me in, and please God take me away"; "I don't need to stress B/C well you know how I get"; and, "I know there's no way you could have done it."

Berryhill testified in his own behalf that when Peyton was choking in early October, he patted him, turned him upside down as Maralie had told him to do if Peyton choked, "squeezed him twice with my hands," and "pushed on his chest . . . because it just seemed logical." He also testified that on the day of Peyton's seizure, Peyton awoke at 5:30 a.m. and would not eat or burp, he laid Peyton down to sleep, went to sleep himself, awoke at 7:00 a.m., awakened Maralie, and kissed her goodbye as she checked on Peyton. He said he was not one to show emotion, attempted to block out as much as possible his feelings during the aftermath of Peyton's death, and went fishing at the suggestion of a friend who was trying "to take my mind off things." Berryhill also introduced the testimony of a pathologist that "immediately" after such fatal injuries in a child, symptoms would be exhibited that include unconsciousness, and "then it would develop seizures."

The evidence was sufficient to authorize the jury to determine that the State excluded all reasonable hypotheses save that of Berryhill's guilt, and to authorize a rational trier of fact to find Berryhill guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Banta v. State*, 282 Ga. 392, 395-396 (1) (651 SE2d 21) (2007).

2. The trial court denied Berryhill's motion to exclude evidence regarding his behavior at the hospital while Peyton was alive, and at the funeral, that tended to show that he failed to grieve for the victim. "The evidence cited by defendant was relevant to the case and was not rendered inadmissible by the fact that it only incidentally placed his character in issue. [Cits.]" *Mullinax v. State*, 273 Ga. 756, 760 (3) (545 SE2d 891) (2001). See also *Riley v. State*, 278 Ga. 677, 687 (10) (605 SE2d 488) (2004); *Bagwell v. State*, 270 Ga. 175, 178-179 (1) (c) (508 SE2d 385) (1998); *Allanson v. State*, 235 Ga. 584, 587 (4) (221 SE2d 3) (1975).

3. During the testimony of the medical examiner, the State tendered for publication a series of 13 photographs. Berryhill objected to 11 of them. The court refused to admit eight, admitted three, and Berryhill enumerates as error the admission of those three photographs.[2]

---

[2] Berryhill states in his brief that four photographs were admitted over objection, but

Photograph 2-L depicted Peyton's body just prior to the beginning of the autopsy; the photograph showed surgical incision marks on it. Berryhill contends that the admission of this photograph violated the rule pertaining to post-autopsy incision photographs that this Court announced in *Brown v. State*, 250 Ga. 862, 867 (5) (302 SE2d 347) (1983), i.e., that "[a] photograph which depicts the victim after autopsy incisions are made or after the state of the body is changed by authorities or the pathologist will not be admissible unless necessary to show some material fact which becomes apparent only because of the autopsy." Id. at 867. But, the photograph at issue depicts the body as it appeared before any autopsy incisions; the incisions that Berryhill complains of were the result of earlier medical procedures undertaken during an organ harvest after the attempts to keep Peyton alive failed. See *Jenkins v. State*, 270 Ga. 607, 609 (3) (512 SE2d 269) (1999); *McRae v. State*, 282 Ga. App. 852, 853 (640 SE2d 323) (2006). Further, the trial court specifically found that the photograph was not "particularly graphic." It was not an abuse of discretion to admit it. See *McWilliams v. State*, 280 Ga. 724, 725 (2) (632 SE2d 127) (2006).

Photographs 2-R and 2-S displayed the body's exposed rib cage and the calcification of ribs broken weeks before Peyton's death. These injuries formed the basis of charges against Berryhill of cruelty to a child and aggravated assault, separate from the acts that immediately caused Peyton's death. The photographs assisted the medical examiner in his testimony, and it was not error to admit them. *Jackson v. State*, 272 Ga. 429, 430 (2) (531 SE2d 700) (2000).

4. During an interview at the hospital, prior to his arrest, Berryhill began to hyperventilate, and the State was allowed to elicit testimony of that fact from the law enforcement officer who conducted the interview. Berryhill objected that to allow such testimony placed him in the position of having to expand on this testimony during cross-examination. The hyperventilation occurred during the officer's questions regarding Berryhill's family history, and what may have happened to him as a child, and Berryhill did not want to place such information before the jury. The court noted that Berryhill would be able to cross-examine the law enforcement officer regarding the circumstances of the hyperventilation. There was no error; the witness merely testified as to his observations, and the weight of such testimony was for the jury. See *Bridges v. State*, 279 Ga. 351 (613 SE2d 621) (2005); *Bridges v. State*, 246 Ga. 323, 324 (2) (271 SE2d 471) (1980); *Duncan v. State*, 269 Ga. App. 4, 7 (2) (602 SE2d 908) (2004).

---

photograph 2-T was, in fact, not admitted, and this Court will not address Berryhill's argument regarding it.

5. When Berryhill hyperventilated during the interview, the law enforcement officer broke it off and sought a physician, who stated that Berryhill would be fine. The State asked the officer if he continued the interview, and the officer stated: "I tried. Basically, the same questions, asked him what happened and he wouldn't answer anything else besides a statement that he muttered." Berryhill announced that he had a motion to make outside the jury's presence, and the jury was removed. Berryhill then moved for a mistrial on the ground that the State was attempting to put before the jury that Berryhill refused to answer questions. The court instructed the jury to "disregard any answer that suggested that [Berryhill] refused to answer any question" during the interview, and Berryhill renewed his motion.

Assuming that the testimony was improper, it was harmless, as the officer's response "did not strike at or point directly at the substance of defendant's defense." *Williams v. State*, 268 Ga. 452, 454 (3) (490 SE2d 381) (1997) (citation and punctuation omitted). See also *Tennyson v. State*, 282 Ga. 92, 94 (4) (646 SE2d 219) (2007). Furthermore, the court gave an appropriate curative instruction, and there was no abuse of discretion in denying the motion for a mistrial. *Whitaker v. State*, 283 Ga. 521, 524 (3) (661 SE2d 557) (2008).

6. Finally, Berryhill contends that before Peyton's death certificate was admitted into evidence, the word "Homicide" should have been redacted from the statement of the cause of death. There was no error; " 'the word "Homicide" was nothing more than an indication of the immediate agency of death.' [Cit.]" *Bennett v. State*, 265 Ga. 38, 40 (453 SE2d 458) (1995).

*Judgments affirmed. All the Justices concur.*

DECIDED MARCH 27, 2009.

*Jason P. Carini, Harold B. Baker, Timothy L. Eidson, Clinton L. Lott IV*, for appellant.

*Denise D. Fachini, District Attorney, Christopher S. Cohilas, Assistant District Attorney*, for appellee.